Mr. Justice Teacher
delivered the following opinion.:
This is an application for the discharge under the writ of habeas corpus ad subjiciendum,
*769 The facts of the case are in brief as follows : —The petitioner, as editor of a public journal, called the Yicksburg Sentinel and Expositor, published an article in his paper reflecting upon the judicial conduct of the judge of the circuit court of Warren county, pending a capital trial. An attachment for contempt was issued against him, and upon interrogatories addressed and answered, the petitioner was, by the court, ordered to be imprisoned for the term of five months, fined five hundred dollars, and to remain in custody until the fine was paid. The petitioner then prayed the executive clemency, which was extended to him to the amount of both fine and imprisonment, by virtue of which he was discharged from custody by the sheriff of Warren county. Subsequently to this discharge, the circuit court of said county issued its bench warrant for the arrest of the petitioner, as an escaped prisoner, by virtue whereof, he is now arrested and detained. This writ is sued out by him for his liberty.
Upon the threshold of this investigation, counsel have suggested a doubt of the power of a single judge of the high court of errors and appeals to issue and act under this writ. To resolve this, we must ascertain what was the writ at common law, and what it is under the constitution, statutes and common law of this state. Personal liberty, by the laws of England, was considered a strictly natural right, and not to be abridged without sufficient cause, nor at the mere discretion of the magistrate, without the explicit permission of the laws. Magna charta declares that no freeman shall be taken or imprisoned, but by the lawful judgment of his equals, or by the law of the land. (Mag. Chart, c. 29.) When any person was restrained of his liberty, by order or decree of any illegal court, or by the command of the king’s majesty in person, or by warrant of the council board, or of any of the privy council, he was entitled, on demand, to the writ of habeas corpus, to have judgment upon the justice of his commitment. English writers, in commenting upon the British constitution, express themselves in the warmest terms upon what is in that country called “the subjects’ writ of right” “ Of great importance,” they say, “ to the *770 public is the preservation of this personal liberty, for if once it were left in the power of any, the highest magistrate to imprison arbitrarily, whenever he or his officers thought proper, there would soon be an end of all other rights and immunities. Personal liberty ought not to be abridged in any case without special permission of law; and the glory of the English law consists in clearly defining the times, the causes, and the extent, when, wherefore, and in what degree, the imprisonment of the subject may be lawful. Nevertheless, shifts and devices, not very creditable, to the judges of the' times, were made use of to secure to the king the power to commit by his special command, and'others were forced into practice, which from time to time have been checked by parliamentary enactments.” Tomb L. D. title Hab. Cor. Sir W. Blackstone has said, “ that the principal aim of society is to protect individuals in the enjoyment of their absolute rights which were invested in them by the immutable laws of nature, and hence it follows, that the first and primary end of human laws is to maintain and regulate these absolute rights of individuals. 1 Bla. Com. 125. This high prerogative writ is issuable from the courts of king’s bench, common pleas, exchequer and chancery, in term time, and before a single judge of either in vacation. Anciently, no one in any case could controvert the return of a habeas corpus, upon which alone the court or judge decided upon the legality of the commitment or detainer. But by virtue of 56 G. 3, c. 100, s. 4, a prisoner brought up under a habeas corpus issued at common law, may controvert the truth of the return. The judgment of the court or judge is final. Thus it is seen that this writ is founded on the common law, and gradually improved and extended in England by statutes to carry into actual and practical utility the free privileges of the subjects secured to them by magna charta and the constitution. It creates a jurisdiction, distinct, separate and independent, and though courts, and judges of those courts, are nominated by law to exercise it, they do so, not by virtue of their otherwise judicial character, authority and jurisdiction, but by the actual grant of power to act in this particular.
*771 This writ has been transplanted, to this country, and assuredly it has lost nothing of those virtues so lauded by foreign writers because of its removal to a land enjoying far more enlarged and enlightened sentiments upon persona] rights and franchises. Both the present and the former, constitution of this state guaranty to its citizens the benefit of the writ of habeas corpus. Under the first constitution, the mode of issuing and the proceedings under the writ were regulated by statute, June 11, 1822. The power to issue the writ was deposited with the supreme, the circuit and the chancery courts, in term time, or any judge of either in vacation. The present constitution established the high court of errors and appeals, with a jurisdiction such as properly belongs at law to a court of that name. By law, H. and H. 531, s. 6, the several acts for the organization of the supreme court, not repugnant to the constitution or inconsistent with the act establishing the high court of errors and appeals, were declared to be in full force for the government of the high court of errors and appeals. By the constitution, (Const. Sched. s. 4,) all laws then in force, not repugnant to it, were continued in operation. Then, that through the force of the constitution, the statutes and the common law, the judges of the high court of errors and appeals, which is now the supreme court of this state, possess a full jurisdiction, and one greatly enlarged by the statutes beyond that of the writ at common law, over this writ, but in their individual capacity alone, seems plain and obvious, but that they have not power to act thereon, in the first resort as a court, seems equally plain and palpable. The statute, H. and H. 664, s. 7, gives to any party to the judgment on the writ, aggrieved thereby, the right to a writ of error, which could only be returnable into the high court of errors and appeals, thus involving, if the court must act in the first instance, the solecism and absurdity of an appeal from a court to itself. It is always proper to give such a construction and interpretation to a statute as will make it consistent with itself and the end to be attained by it.
Without directing attention to the questions of the sufficiency of the bench warrant, or to other technical objections, which, whether ill or well taken, are swallowed up in the more import *772 ant questions involved in this examination, I will proceed at once to the discussion of the leading and prominent points that stand forth in this interesting controversy.
( The power of courts to imprison for contempts is declared by English writers, and so quoted by writers on this side of the Atlantic. It has been repeatedly decided in the English courts, and those decisions followed in the courts of this country, to be of immemorial usage and practice, since the law itself was known. It is claimed to be a vitally essential attribute and consequence of the administration of the law itself, without which it dies, becomes a dead letter, a command without obedience, a judgment without execution. It is held to have arisen from the necessity of the thing itself, and though not until later times legislated upon, it is said to have become the law of the land, coeval with the period when the administration of law was established, in the shape of courts and other legal tribunals. It is in this point of view that it is insisted by Blackstone (4, 237,) to have been confirmed by the statute of magna charta when it requires that “no freeman shall be imprisoned and condemned, but by the judgment of his peers, or by the law of the land.” Now this charter bears date the 15th June, A. D. 1215, being the 17th year of the reign of King John. The first enactment upon the subject of contempts was that of the statute of Westm. (13 Ed. I. c. 39,) being seventy years after the date of magna charta. This statute has reference to contempts in resisting the process of the king’s courts. This species of contempts is classed by Blackstone (4, 235,) among those of consequential contempts. If then the power to punish the class of consequential contempts constituted a part of “ the law of the land” so long anterior to the date of magna charta as to have become at that early day a very maxim of law, where was the necessity for legislation upon the subject 1 Why should parliament have legislated upon an individual instance of consequential contempt, unless the evil were then first discovered, and a remedy then, for the first time, sought % To what extreme the courts had extended their jurisdiction over contempts, up to the time of magna charta, we have no actual knowledge — it is but conjecture; but that *773 seventy years afterwards, parliament, for the first time, legislated upon the subject, we do have proof; and we have further proof from the language of the statute and the grant of power to the courts, that such was, in its nature, an enlarged power, which consequently presumes its non-existence until the passage of that act. The phraseology of the preamble of that statute most strongly fortifies this position. The reason for the enactment is given in the following language, and Lord Coke says the preamble of a statute is a good means to find out the intention of if;: “forasmuch as justices, to whose office it belongeth to minister justice to all that sue before them, are many times disturbed in due execution of their office,” <fcc. This, at the present day, would be deemed a consequential contempt of court, and if it were so before magna charta, and the power dwelt in the courts then to punish and check it, the statute was certainly uncalled for legislation; but if so, it is a solitary and isolated instance of such at that early period. It was by a train of similar reasoning, I imagine, that a very learned author, as he is styled by Blackstone, 4, 237, (see Gilb. Hist. C. P. c. 3,) was inclined to deduce the present doctrine of contempts exclusively from this statute, and to allow it no greater antiquity. How much then of the present doctrine in England owes its origin to that and subsequent legislation, and how much to judicial assumption of power, it is here unnecessary to inquire, but in stating the historical argument, all that with fairness can be said is, that magna charta conferred to the courts the power to preserve themselves, and no more, and not that it necessarily recognized, as the law of the land the many kinds of contempts now known to the courts and judges. For so far as the newspaper publication of a libel upon a court is concerned, a case of the kind could not have occurred until the time of Queen Elizabeth, when newspapers were first established, which was three hundred and forty-three years after the date of magna charta. The proposition which is thus laid down is, that the doctrine of consequential contempts, in its present broad understanding, was unknown to and not confirmed by the earliest constitutional law of England — magna charta.
*774 We must next test this doctrine of contempts by the touchstone of the constitution of the state. This is the only proper, legal and safe criterion by which it can be judged and decided upon. In doing so, we must be careful to allow no hypothetical interpretations, or equivocal definitions of the explicit text of this instrument. It is a compact between the people and their officers. There are restraints placed upon both. Power to govern has been confided, but it has also been limited and restricted. It remains then to examine whether the exercise of power in the case now under consideration, is within the constitution and laws of this state.
Immediately upon the adoption of our constitution, and before the enactment of any statutory law, so much of that which is generally termed “ the common law,” and which is also strictly in accordance with that constitution, was likewise necessarily adopted. For instance, the constitution established and erected courts of justice. It gave them the jurisdiction of courts of justice as the same were before understood, less so much power and authority as trenched on that constitution which created them. To carry on these courts, certain machinery is necessary, and that machinery must be without clog, hindrance or interference. This was necessary to the ends of their creation, for the exercise of the functions entrusted to them, and indispensable to serve and vindicate the interest and dignity of the government, which has been built up by the people. Is then the case in hand, the use of a power vested in our courts either directly or by implication, and is the act for which the petitioner is now imprisoned a clog upon the wheels of courts of justice 7 I shall endeavor to show why they are not.
What is a contempt of court ? Besides the various classes of contempts which were known to the common law of England and particularly described, besides these relating to officers and others connected with the courts, concerning which the law is plain and explicit, there are many which are claimed to lie exclusively within the discretion of the courts. The belief in the existence of such is alone in the breast of the court. They may be construed to spring from a gesture, a word or a look. *775 Thus the court is constituted the judge of his own privileges and the vendicalor of his own wrongs, whether real or supposed, and his jurisdiction in this particular is without measure. The offence is without specification and without definition; and though legally viewed, it is said to refer solely to the functionary, it necessarily touches and stimulates the individual, who finds it hard to separate himself from the office and station. It may thus become an offence of opinion, of feeling or of prejudice — an offence which has no other legislation than the imperfections of human nature, blinded and misled by the circumstances of the moment, notions of caprice, and the improper bias of passion, or by those powerful, but imperceptible influences from which the most upright and enlightened minds cannot be considered or trusted to be wholly exempt. The power of pnnishing may be extended to a degree despotic, and, as it is extended in a judicial capacity, it is irresponsible, and may therefore be used regardless of consequences. Under such a state of things, liberty and property may become precarious and there is no protection against oppression. The rights and privileges which our constitution has retained and reserved to its citizens may thus be despotically abridged or wholly refused, and their “remedy by due course of law denied” or at least “delayed,” until vendicated and restored by the slow process of the proverbially sluggish channels of jurisprudence. Many cases of the infringement of constitutional rights could be conceived and enlarged upon to illustrate in strong relief this position, but the mere admission of the principle of entire and complete power without responsibility, to adjudicate for the time being upon those rights and privileges, will suggest them to all freemen who are acquainted with, and jealous of what of right belongs to them as their inheritance under our form of government. It is a legal motto, full of meaning and not too strong in expression, which declares that,
" Misc.a est servilus, ubi lex est vaga aut incerta.”
And certainly in no code of laws, can be pointed out one more obnoxious to this reproach, than that of a supposed offence *776 which finds its enactment, its tribunal and its punishment in one and the same source. As we have already seen, history teaches us that the origin of this doctrine grew out of a state of things happily unknown and unrecognized by us. Anciently, in England, the king presided in some of the courts and sat himself in judgment. The insult, as it was considered there, was addressed to majesty in person, and was, in the spirit of such a government, met with prompt, and often mortal punishment. Death and forfeiture of lands and titles were alone sufficient to atone for the offended dignity of the throne. But as a better reason grew up among men, and liberty was either enlarged or its character better understood in England, this, among other severities, passing through various stages of lesser cruelty and hardship, became modified and ameliorated, until it found its present limit and extent. It were not a bad argument then to insist that, in introducing such a principle into our especially free government, it needs must receive a correspondent abatement of those of its features which are at war with the nature of the constitution and laws into which it has been admitted. Surely the same principle should be allowed to hold in a country which rests upon the love, as in one which is enforced from the fears of its people. For in this country, there is no majesty save the majesty of the law, and the office of that majesty is to guaranty to the sovereign citizen his constitutional liberties.
It has been before admitted that there have been in England, and in this country, judicial decisions establishing in that country, and in some states of this, the legitimacy of the exercise of power in cases like the one under consideration. Either that power is derived ex necessitate rei, or it is the growth of legislation and judicial practice. In the last event, as by the circumstances of this case it seems to be, it can be claimed only by virtue of its being one of the lineaments of the common law of England. In what position do this country and this state stand in relation to that common law 1 The United States have not taken, in all respects, the common law of England. So much only of its general principles are claimed and adopted *777 which is applicable to our situation, institutions and form of government. Van Ness v. Pacard, (2 Peters, 144.) Nor is there any such thing as a common law of the United States. The constitution and laws of the Union prevail as the authority of law throughout the Union, but each independent state may have its own common law which may not so be considered in another. Wheat, et al. v. Peters, et al. (8 Peters, 658.) When therefore, a common law power is asserted, we must look to the constitution and laws of the state in which the controversy originated. The constitution and laws of Mississippi jealously guard the freedom and rights of its citizens. The 11th section of its declaration of rights declares that no person shall be accused, arrested or detained, except in cases ascertained by law, and according to the form which the same has prescribed ; and no person shall be punished but in virtue of a law established and promulgated prior to the offence and legally applied. Its 16th section declares that excessive fines shall not be imposed nor cruel punishments inflicted. The 10th, that no citizen shall be deprived of his life, liberty, or property, but by due course of law. Yet by the doctrine of contempts, as insisted upon, there exists an offence not only undescribed and undefined in nature and character, and one whose very existence is dependent upon the opinion and discretion of a judge, but a punishment, to use the words of Senator Clinton, in Yates v. The People, (6 Johns. 467,) “ unlimited, uncontrolled, indefinite, arbitrary, and omnipotent.” “It is to be remembered,” he adds, “ that summary convictions are against the genius and spirit of our institutions, and in derogation of civil liberty. The judge is without check, and the accused without the usual guards of freedom. There is no grand jury to accuse, no petty jury to try, but his property and liberty depend upon the fiat of the court.' Here, then is a case where an unjust and tyrannical judge may, at pleasure, imprison an innocent man for life, and being a judicial act for which he cannot be questioned, thus place punishment at defiance. A doctrine pregnant with such horrible results, can never be in unison with the letter or the spirit of a free and enlightened system of jurisprudence.” *778 These views of Senator Clinton, even if considered in the light of argument only, are most valuable and worthy of weight, not only as being those of a man of great political knowledge and ardent patriotism, but from the fact of his removal and distance from any of those selfish feelings that might be supposed to influence a judicial functionary, keenly jealous and tenacious of his self-constituted privileges, powers and immunities. For this is a quasi political question, as all such are, which involve the liberty of the citizen, restrained upon grounds not palpably and clearly established and defined by law. The argument derived from the possible duration of the punishment of an indefinite offence presents the doctrine of constructive, consequential and implied contempts in hostile opposition to the constitution. It cannot bear the collision.
It is a maxim of law that where a discretion is allowed courts in the punishment of defined offences, that discretion must be regulated by law. But in this instance, the law, as claimed, sets to itself no bounds, and, under the influence of strong passions, punishment may be inflicted to a cruel, an unusual and excessive degree. The records of the English courts are not without glaring examples, under this authority, which might be hence quoted as precedents for imitation. There are no guards, then, against a resort to the most tyrannical licentiousness, and it is not an unreasonable jealousy to distrust men clothed with arbitrary power. It is certainly better that the freedom of the citizen should be controlled by fixed and plain laws, than to be left dependent upon the uncertain moderation of those in power. The authority to punish at pleasure, and during pleasure, is indeed, more consonant and agreeable to a throne, without responsibility, than to tribunals of justice erected upon free and equal laws.
It is to be noted that our constitution, unlike some others of the states of the Union, does not contain a recognition, in so many words, of a “ law of the land ” presupposed to exist. As we have seen, it is upon the slight foundation of this phrase, that the doctrine of constructive contempts is claimed to have been recognized and reenacted by magna charta, and upon the *779 same principle to be in force in those states where this term makes its appearance in their constitutions. For these words, in the constitution of Mississippi, has been supplied the language, “due course of law.” A practice of the courts, however remarkable for its antiquity, however far back into a remote period it looks for its origin, even to a period whereto the memory of man runneth not, even though evidenced by published works upon jurisprudence, carefully preserved from the earliest times of extant printing or manuscripts, claims no respect or veneration, when it is shown to be unessential to the existence, utility or preservation, of those courts, but on the contrary to be the fruitful source of many of the evils to explode which a new system of government and an improved code of laws have been established. We have before our eyes the best evidence of the needlessness of any such authority to secure to courts those essential ends, their existence, their utility and their preservation. It is in the established law, by statutory enactments upon this subject, of the United States and of some of our sister States. We are thus presented with a complete practical refutation of the whole argument which would attempt to vindicate the propriety of the claim to 'this power by the courts upon the basis of expediency and necessity. The act of congress, of March 2d, 1831, ch. 93, limited and defined the power over all contempts of courts of the United States, by declaring that the power to issue attachments and inflict summary punishments for contempts of courts, shall not be construed to extend to any cases except the misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice; and the misbehavior of any of the officers of the said courts in their official transactions ; and the disobedience, or resistance by any officer of said courts, party, juror, witness or any other person, to any lawful writ, process, order, rule, decree or command of the said courts. A similar statute has been enacted in Ohio, with the further restriction that the accused shall be heard in his defence, by himself or counsel. In the “system of penal law, prepared for the state of Louisiana,” in 1824, by Edward Livingston, Esq., *780 contempts could only be committed in presence of the court, or in pleadings or writings addressed to the judges in pending cases, and these were tried by indictment, whereby a jury found the fact. The civil code of Pennsylvania, in 1835, confined the power of imprisonment to contempts committed in open court. No publication out of court, respecting the conduct of the court, or any of its officers, jurors, witnesses, or parties in any cause pending in court, exposes the party to summary punishment, and the only remedy, for the persons aggrieved, is by indictment, or action at law. In states, then, established upon the same republican principles as our own, having courts of justice of similar jurisdiction and like authority, needing the same inherent capacity for self-preservation, and the same influence over the public mind to render them efficacious for the ends of their creation, and beneficial to the interests and purposes of their government and their people, the common law power of the judges over contempts is found to be unnecessary and useless. From this it is therefore fairly and irresistibly deducible, that the motive for arrogating a claim to an authority of this kind being taken away, and the claim being predicated upou that motive, the authority must go with it, or, in the language of the legal motto, “ cessante rations, cessat et ipsa lex.”
But our own legislature has passed a law upon this subject in these words : “ The courts shall have power to fine and imprison any person who may be guilty of a contempt of the court, while sitting, either in the presence or hearing of such-court : provided, that such fine shall not exceed one hundred dollars, and no person, for such contempt, shall be imprisoned for a longer period than the term of the court at which the contempt shall have been committed.” H. and H. 436, 26. The same law, it is to be remarked, is made applicable to the circuit, the chancery, and the high court of errors and appeals. This statute describes clearly the offence, and affixes for it a limited, terminable and definite punishment.. Upon what prinple can the legislature be supposed to have overlooked the existence, if any such could be imagined under our constitution, *781 of a power unlimited, ungranted and undefined, to punish con-tempts of courts without their walls, acts unaffecting the decorum or respect of their presence? A greater offence is thus made subject to circumscribed chastisement, and a lesser is left liable to an infinite degree of punishment. The sense, spirit, scope, and intention of a statute, are to be regarded in its construction, and judges are so to construe it as to suppress a mischief, or advance a remedy. Dwarris, 718. Is not the power of punishing implied contempts mischievous — should it not be remedied? Our statute, by this rule of interpretation, should be pronounced declaratory of the law upon the subject of con-tempts, so far as they are committed by general persons. A common sense survey of the statute creates a forcible implication that its language details the circumstances which can alone constitute a contempt of our courts. Our legislators frame the laws, acknowledging the constitution as the highest and the only authority on earth for their guide in shaping them. They found in that instrument no such principle as this doctrine of constructive contempts would establish, but rather a precedent and paramount authority to disobey it. They have, in consequence, commanded the subject of contempts of courts, not to be governed, to quote the words of Lord Coke, “by the crooked cord of.the discretion of the judges,” but to be “measured by the golden metewand of the law.”
The shield which our constitution throws around the press has been held up to interpose before the power of the courts to punish for contempts. The most dearly prized offspring of our national liberty, is the freedom of the press. It is so, because it can be made its most effectual protection at home, and because it can be employed as the apostle of those liberties to millions abroad. The worst enemy to freedom is ignorance. Instruct men in the knowledge of their rights, and a vindication of those rights follows as surely as light follows the rising sun. Yet the freedom of the press is abused to base and unworthy purposes. Such, indeed, as sad experience teaches, is often the melancholy fate of the greatest blessings that a wise providence lias bestowed upon us, or that human skill has invented. The *782 free air we breathe is essential to our existence, but when infected with pestilential matter, it becomes the most terrible weapon of death. But who would argue, because disease may-float in the atmosphere, that that atmosphere should be destroyed 1
Our constitution has declared that “ every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty. Art. I. s. 6. The reflections of the petitioner upon the circuit judge of Warren county, as set forth in the petition complained of, when judged by the practice and assumptions of the English, and some of the American courts, constitute an undoubted contempt of an aggravated character; but when passed through the crucible of our state constitution, instead of a contempt of court, they become a mere libel on the functionary, and subject only to the punishment prescribed by law for the latter offence.j)
The effect of the executive pardon upon the sentence of a court for a contempt is the only remaining question of this interesting investigation. The power to pardon is, by English writers, styled the most amiable prerogative of the crown. 4 Bla. Comm. 396. It was cotemporary with the first memorials of the law. In its extent, it reached to all offences against the crown, or the public. Ib. 398. It does not reach to cases where private justice is connected with the prosecution of offenders — non potest rex gratiam facere cum injuria et damno aliorum. 4 Inst. 236. Thus in penal statutes, where the informer has acquired a private property in a part of the penalty, the king cannot pardon the offence. 4 Bla. Comm. 398. But among pardonable offences is that of contempts of courts. In the statute of Westm. 2, 13 Edward I. c. 39, which has before been claimed to have been the origin of the doctrine of constructive contempts, in speaking of the imprisonment of those who resist sheriffs, occur these words, — “ a qua non deliberentur sine speciali precepto domini regisf — from which imprisonment they shall not be released, but by the special command of our lord, the king. It is moreover elsewhere said, that a pardon for all misprisions, trespasses, offences or contempts, will *783 pardon a contempt in making a false return, and a striking in Westminster Hall, and barratry and even a premuniré. Jacobs’s L. D. Pardon; 2 Hale’s P. C. 252; 2 Mod. 52; Dyer, 303, a. The constitution of the state, art. 5, s. 10, bestows upon the governor of the state “ the power to grant reprieves and pardons, and to remit fines in all criminal and penal cases, except in those of treason and impeachment.” But it has been insisted by counsel that contempts of court do not come under the class of criminal or penal cases. The attachment which issues upon the information of a contempt is a criminal process. 1 Tidd Prac. 401. 4 Bla. Comm. 231, calls the offence “a criminal charge.” “ A crime, or misdemeanor, is an act committed, or omitted, in violation of a public law, either forbidding or commanding it.” 4 Bla. Comm. 5. The distinction of public wrongs from private, of crimes and misdemeanors from civil injuries, seems principally to consist in this, that private wrongs or civil injuries are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals, public wrongs, or crimes and misdemeanors, are a breach and violation of public rights and duties, due to the whole community, considered as a community in its social, aggregate capacity, Ib. 6. Contempts of court are treated by all elementary writers as public wrongs. They áre distinguished from ordinary crimes or misdemeanors, because in their punishment there is no intervention of a jury, the party being acquitted or condemned by the suffrage of such person only as the statute has appointed for his judge. Ib. 279, tit. Summary Conviction. In short, the whole doctrine of con-tempts goes to the point that the offence is a wrong to the public, not to the person of the functionary to whom it is offered, considered merely as an individual. It follows, then, that the contempts of court are either crimes or misdemeanors in proportion to the aggravation of the offence, and as such, are included within the pardoning power of this state. But, say the counsel, there are certain courts which have only civil jurisdiction, and yet those courts have the power to punish for con-tempts, therefore a contempt is not a criminal offence. This *784 conclusion is a non seqtdiur from the statement of the case. The statement of the case shows that to the civil jurisdiction of the courts alluded to, a sufficiency of criminal jurisprudence is also necessarily attached for restraining offenders from interrupting their proceedings, for without it they must cease to exist.
Prom all the foregoing considerations, I am brought to the belief that the petitioner is held in custody by unlawful authority, and that he is clearly entitled to his discharge therefrom ; which is therefore ordered and decreed.