# EX PARTE IN THE MATTER OF PHILIP GROSSMAN, PETITIONER.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 24, Original. Argued December 1, 1924.—Decided March 2, 1925.

1. A criminal contempt, committed by disobedience of an injunction issued by the District Court to abate a nuisance in pursuance of

the Prohibition Law, is an "offence against the United States," within the meaning of Article II, § 2, Cl. 1 of the Constitution and pardonable by the President thereunder. P. 108.

2. Before our Revolution, the King of England had always exercised the power to pardon criminal contempts, the pardon being efficatious in so far as punishment was imposed in the public interest, to vindicate the authority of the King and Court (criminal contempt), but not in so far as imposed to secure the rights of a suitor, (civil contempt). P. 110.

3. The like distinction between criminal and civil contempts is clearly made in our law. P. 111.

4. The history of the pardon clause in the Constitutional Convention, *cited* to show that the words "offences against the United States" therein were intended, presumably, to distinguish between offences against the General Government and offences against the States, and not to narrow the scope of a pardon as known in the common law. P. 112.

5. There is no substantial difference in this matter between the executive power of pardon in our Government and the King's prerogative. P. 113.

6. Nor does the ruling of this Court in *United States* v. *Hudson* 7 Cranch, 32, limiting the exercise of ordinary federal criminal jurisdiction to crimes defined by Congress, afford reason for confining "offences against the United States," in the pardon clause, to statutory crimes and misdemeanors. P. 114.

7. Construction of "offences against the United States" in the pardon clause as including criminal contempts, accords with the ordinary meaning of the words and is not inconsistent with other parts of the Constitution where the term "offence" and the narrower terms "crimes" and "criminal prosecutions," appear. Art. I, § 8; Amendments V and VI. P. 115.

8. The power of the President to pardon criminal contempts is sustained by long practice and acquiescence. P. 118.

9. The contention that to admit the power of the President to pardon criminal contempts (not to interfere with coercive measures of the courts to enforce the rights of suitors) would tend to destroy the independence of the Judiciary and would violate the principle of separation of the three departments of the Government, is considered and rejected. P. 119.

Rule in *habeas corpus* made absolute and prisoner discharged.

*Habeas corpus,* original in this Court, to try the constitutionality of petitioner's confinement notwithstanding a

pardon granted by the President. The petitioner was found guilty by the District Court of having disobeyed a temporary injunction, issued under the Prohibition Act, forbidding illicit traffic in liquors on certain premises. He was sentenced by the District Court to pay a fine and to imprisonment for one year in the Chicago House of Correction—a judgment which was affirmed by the Circuit Court of Appeals. 280 Fed. 683. The President issued a pardon commuting the sentence to the fine, upon condition that the fine were paid; which was done. Having been thereupon released from custody, the petitioner was again committed by the District Court, upon the ground that the pardon was ineffectual, 1 Fed. (2d) 941. He then sought this writ of *habeas corpus,* directed to Graham, the Superintendent of the House of Correction.

*Mr. Louis J. Behan,* with whom *Mr. Robert A. Milroy* and *Mr. William J. Corrigan* were on the brief, for petitioner.

I. The petitioner was convicted of criminal contempt. *Pino* v. *United States,* 278 Fed. 479; *McGovern* v. *United States,* 280 Fed. 73; *Grossman* v. *United States,* 1 Fed. (2d) 941.

II. A criminal contempt is an offense against the United States because:

(a) The courts have held it to be " a specific criminal offense." *In re Kearney,* 7 Wheat. 38; *New Orleans* v. *N. Y. Mail S. S. Co.,* 20 Wall. 387; *In re Swan,* 150 U. S. 637; *Fanshawe* v. *Tracy,* 4 Biss. 490; *Fischer* v. *Hayes,* 6 Fed. 63; *In re Ellerbee,* 13 Fed. 530; *United States* v. *Berry,* 24 Fed. 780; *Kirk* v. *Milwaukee Dust Collector Mfg. Co.,* 26 Fed. 501; *Bullock Electric & Mfg. Co.* v. *Westinghouse,* 129 Fed. 105; *United States* v. *Jacobi,* 26 Fed. Cases, 564; *In re Litchfield,* 13 Fed. 863; *In re Acker,* 66 Fed. 290; *Passmore Williamson's Case,* 26 Pa. St. 9; *State ex rel.* v. *Sauvinet,* 24 La. Ann. 119; *Sharp* v. *State,*

102 Tenn. 9; *In re Shull*, 221 Mo. 623; *Schwartz* v. *Superior Court*, 111 Cal. 106; *Lester* v. *People*, 150 Ill. 408.

(b) In a criminal contempt, the defendant is presumed to be innocent until guilt is proved beyond a reasonable doubt. *United States* v. *Jose*, 63 Fed. 951; *Michaelson* v. *United States*, 266 U. S. 42; *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418; *Jones* v. *United States*, 209 Fed. 585; *Oates* v. *United States*, 233 Fed. 201; *Kelly* v. *United States*, 250 Fed. 947; *Galen* v. *United States*, 250 Fed. 947; *In re Cashman*, 168 Fed. 1008; *United States* v. *Carroll*, 147 Fed. 947.

(c) Prosecutions for criminal contempt are barred by the statute of limitations. *Gompers* v. *United States*, 233 U. S. 604.

(d) In criminal contempt cases the provisions of the Federal Penal Code with respect to removal, arrest and bail are applicable. *Castner* v. *Pocahontas*, 117 Fed. 184; *United States* v. *Jacobi*, 26 Fed. Cases 564, 566.

(e) Review of criminal contempt is the same as in other criminal cases. *In re Merchants Stock & Grain Co.*, 223 U. S. 640; *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418; *In re Christensen Engineering Co.*, 194 U. S. 458.

III. The authority of the President to grant pardon for criminal contempt is sustained:

(a) By custom and usage prior to and at the time of the adoption of the Federal Constitution. *United States* v. *Wilson*, 7 Pet. 150; *Ex parte Wells*, 18 Howard 307; 4 Blackstone Comm. 398; 3 Coke's Institutes, Chap. 105; 5 Comyns Digest, 171, 173, 4th Ed.; 2 Hawkins Pleas of Crown, Secs. 26, 33, Chap. 37, 8th Ed; *Bartram* v. *Dennett*, 23 Engl. Repts. 132, 139; *Barber's Case*, 1 Strange 444; *Bockenham's Case*, 1 Levinz 106; *King* v. *Rodman*, 4 Croke 198; *In re Bahama Islands*, A. C. 138 (1893); *Ex parte Fernandez*, 10 C. B. (N. S.) 25; 142 Engl. Repts, 358; *Seward* v. *Patterson*, 1 Chan. 545; Madison's De-

bates of Federal Convention; Farrand's Records of Federal Convention, Vol. I and Vol. II; Madison's Journal of Federal Convention; The Federalist, Letter LXXIV (Hamilton).

(b) By custom and use since the adoption of the Constitution. 3 Op. A. G., 622; 4 Op. A. G., 458; 19 Op. A. G., 476.

(c) By the broad terms in which the pardon power is granted, and by the specific exception of impeachment cases. See *United States* v. *Wilson,* 7 Peters 150; *Ex parte Wells,* 18 How. 307; *Ex parte Garland,* 4 Wall. 333; *United States* v. *Klein,* 13 Wall. 128; *United States* v. *Thomasson,* 28 Fed. Cas. 82; 13 Corpus Juris 97; 29 Cyc. 1563; 6 Ruling Case Law, 540; 20 Ruling Case Law 537; 1 McClain Crim. L. (1897 Ed.) Sec. 9; 1 Bishop Crim. Law (7th Ed.) Sec. 913; 1 Kent's Comm. (14th Ed.) 343; Story on Const., Vol. 3, Sec. 1488; Rawle on Const. (2d Ed.) 174; 7 Bacon's Abridg., 405, (1845 Ed.); 2 Curtis Hist. Const., 413; 2 Willoughby Const. 1270; Oswald on Contempt (1911 Ed.) 3; 1 Jour. Crim. Law and Criminology 549; 43 Amer. Law Rev. 192; 49 Amer. Law Rev. 648; Ency. Britt., 11th Ed. "Contempt"; *United States* v. *Arrendondo,* 6 Pet. 691; *Bend* v. *Hoyt,* 13 Pet. 263; *Arthur* v. *Cummings,* 91 U. S. 362; *Diehl* v. *Rogers,* 169 Pa. St. 316.

(d) By adjudicated cases on power to pardon contempt. *Ex parte Fiske,* 113 U. S. 713; *Bessett* v. *Conkey,* 194 U. S. 325; *In re Mullee,* Fed. Cas. No. 9911; *In re Mason,* 43 Fed. 510; *Castner* v. *Pocahontas Collieries Co.* 117 Fed. 184; *Butte & C. Co.* v. *Montana Ore Co.,* 158 Fed. 131; *Ex parte Hickey,* 12 Miss. 751; *State, ex rel.* v. *Sauvinet,* 24 La. Ann. 119; *In re Browne,* 2 Colo. 553; *Sharp* v. *State,* 102 Tenn. 9.

The purpose of the contempt proceedings in the case at bar was to assist in the administration of a public law, criminal in its nature; the injunction was directed against acts that were crimes and punishable as such, and the

violation of the injunction was punished, not primarily to vindicate the authority of the court, nor to protect its process of adjudication, but to stop the repetition of such conduct as the legislative policy of the United States had declared to be criminal. The reasons of policy that support executive pardons for crimes are as applicable to the punishment of offenders by contempt proceedings as to the punishment of offenders by ordinary criminal proceedings, whenever the purpose of the former is solely or primarily to secure the enforcement of the criminal law.

It is no more a reflection upon the courts to recognize the pardoning power in the President in a case of a criminal contempt, than to recognize such power where the criminal laws of the people enacted by the legislature have been violated and the defendant is sentenced to imprisonment by the court. The right to punish for contempt of court, cannot be superior to the rights of the people, for all power in the last analysis is granted by and comes from the people.

The reasons may be as potent for the granting of a pardon when crime is punished by equity in contempt proceedings as when it is punished by a common law judge after a conviction by a jury. That the executive should have the power to pardon both classes of offenders seems logical, consistent and socially desirable, nor does it seem any greater blow to the prestige of the court, that the executive should pardon a defendant's commitment for contempt than that he should remit his sentence for crime—both being imposed for the same criminal act, and perhaps imposed by the same judge sitting first in an equity and then in a criminal term of the court.

*Mr. Amos C. Miller* and *Mr. F. Bruce Johnstone,* Special Assistants to the Attorney General, for respondent.

The natural and ordinarily understood meaning of the words "offences against the United States" does not include contempts of court.

The terms " offence " and " crime " are synonymous and the term " offence against the United States " means the same as " offence against the laws of the United States." Since there are no common law crimes, those terms mean offences denounced as such by the statutes of the United States.

For definitions and instances of the use of the words " crime " and " offence " by courts and text writers see *United States* v. *Wilson,* 7 Peters, 150; *Moore* v. *People,* 14 How. 13; *United States* v. *Hudson,* 7 Cranch 32; *United States* v. *Eaton,* 144 U. S. 677; *In re Chapman,* 166 U. S. 661; *The Laura,* 114 U. S. 411; *Thomas* v. *United States,* 156 Fed. 897; *In re Terry,* 37 Fed. 649; *United States* v. *Boston,* 273 Fed. 535, *Commonwealth* v. *Brown,* 107 Atl. (Pa.) 676; *Dunson* v. *Baker,* 80 So. (La.) 238; *State* v. *West,* 42 Minn. 147; *Cruthers* v. *State,* 161 Ind. 139; *Dominick* v. *Bowdoin,* 44 Ga. 357; *Kopp* v. *French,* 102 N. Y. 583; *Yates* v. *Lansing,* 9 Johns. (N. Y.) 395; 10 Op. A. G. 452; *People* v. *Seymour,* 191 Ill. App. 381; Black's L. Dict. 2d Ed. 487; Stroud's Judicial Dict. 2d Ed. 1318.

These cases disclose a common understanding, extending from (or near) the time of the adoption of the Federal Constitution, that, except in those jurisdictions where there are common law crimes, the word " offence " includes those acts only which have been denounced as such and made punishable by statute.

That contempts of court are " *sui generis* " and the proceedings to punish them are " neither civil actions nor prosecutions for offences within the ordinary meaning of those terms " is the doctrine of this Court. *Bessette* v. *Conkey Co.* 194 U. S. 324; *Eilenbecker* v. *District Court* 134 U. S. 31; *Dunham* v. *United States,* 289 Fed. 376; *Grain Company* v. *Board of Trade,* 201 Fed. 20; *Michaelson* v. *United States,* 266 U. S. 42.

While contempts of court have in some instances been spoken of by this Court as crimes, it is clear that such

classification was for some purpose of procedure only. *New Orleans* v. *Steamship Company*, 20 Wall. 387.

If, as stated by Mr. Justice Holmes in the second *Gompers Case,* contempts of court in England were crimes or offences indictable and punishable as such by the usual criminal procedure, it is because the law of England, unlike our federal law, recognized common law crimes, punishable as such. A contempt of court was not only an offence against the court, it was equally an offence against the King, like every other offence. See dissenting opinion in *Ex parte Wells,* 18 How. 307; *State* v. *Magee Publishing Co.,* 29 New Mexico 455.

As said in *Bessette* v. *Conkey,* 194 U. S. 324, a contempt proceeding is criminal in its nature, in that the party is charged with doing something forbidden, and if found guilty, is punished.

The ordinary classification of contempt as either civil or criminal, can throw no light upon the question here involved. This classification was first adopted, we believe, in the year 1831, in England. *Wellesley* v. *Duke of Beaufort,* 2 Russ. & M. 639, 39 Eng. Rep. 538. It is an artificial one made by the court for the purposes of procedure. It is held by this Court that the violation of a mandatory order of court, punishable by imprisonment or other penalty intended to be coercive, is a civil contempt; whereas, the violation of a prohibitive order of court, punishable by a fine or imprisonment intended as a vindication of the court's dignity, is a criminal contempt. *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418. But it is obvious that the flouting of the court's decree is as much a public offence in the one case as in the other, and as destructive of the court's dignity, power and efficiency (if allowed to go unpunished) and of the rights of parties litigant. Indeed, it has been said in substance by this Court, and it is obviously true, that all violations of court orders are both civil and criminal contempts, because all

proceedings for punishment (whichever aspect domi-nates) are both civil and criminal, in the sense in which the terms are used in the classification; that is to say, all such proceedings, however classified, tend to enforce the property rights of the parties litigant, and also tend to vindicate the dignity of the court, and protect the public respect which is essential to its existence. *Gompers* v. *Bucks Stove & Range Co., supra; Bessette* v. *Conkey Co.* 194 U. S. 324. See *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *People* v. *Peters,* 305 Ill. 223.

The Constitution and its Amendments in different pro-visions treat of " offences against the United States," of " offences," of " crimes " and of " criminal prosecutions." Those terms were doubtless used interchangeably. They have always been regarded as substantially synonymous. No reason can be assigned for the use of the one rather than another in any Article of the Constitution. It is impossible to argue that these different terms were used with different ideas in view. These terms are used in six different Articles of the Constitution. It is impressive, we submit, that no one of the six has ever been held to embrace contempts of court.

*First.* In Article II, § 2, cl. 1, appear the words here in controversy.

*Second.* Article III, § 2, cl. 3, provides that " The trial of all Crimes except in Cases of Impeachment shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed * * *."

Since the foundation of our government, at least, it has been universally held that trials of contempts of court need not be, (and until the enactment of the Clayton Act that they could not be) by jury. It is true that in the second *Gompers Case* 233 U. S. 604 the opinion said that contempts of court, even though crimes, need not, under the Constitution, be tried by jury, because they were not so triable when the Constitution was framed. This, how-

ever, we respectfully submit, would be giving the Constitution a somewhat strained construction, making it read: " The trial of all crimes, except in cases of impeachment, and except in cases now otherwise triable, shall be by jury." And since this Court has held that those almost identical words of the Sixth Amendment do not require a trial for contempt to be held in the district of its commission for the reason that a proceeding for contempt is not a criminal prosecution, we can see no ground for not applying the same reasoning to clause 3 of § 2 of Art. III and thus reaching the same conclusion (that jury trials are not required) without doing violence to the language. That this is the correct reason for the conclusion would seem to follow necessarily from a consideration of the second sentence of clause 3. That a contempt trial need not be held in the State where the contempt was committed would seem to be settled. *Myers* v. *United States* 264 U. S. 95. The sole reason is that a contempt trial is not a trial for a crime. *In re Terry,* 37 Fed. 649.

*Third.* Article IV, § 2, cl. 2, of the Constitution reads: "A person charged in any State with Treason, Felony or other Crime, who shall flee from Justice, and be found in another State, shall on demand of the executive Authority of the State from which he fled be delivered up to be removed to the State having Jurisdiction of the crime." A careful search has disclosed no case holding that contempt of court is or is not extraditable. We venture the suggestion that by common understanding it is not.

*Fourth.* The second provision of the Fifth Amendment reads: " nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself · * · * *."

That punishment as for contempt of court of an act which is also a crime is no bar to a criminal prosecution, is well settled law. See *In re Debs,* 158 U. S. 564; *In re*

*Chapman,* 166 U. S. 661. *Grain Company* v. *Board of Trade,* 201 Fed. 20.

*Fifth.* The Sixth Amendment directs that: " In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed," etc.

It will be noted that the first sentence of this amendment uses the terms " criminal prosecutions " and "crime." It is impossible to argue that one of those terms was intended to be either broader or narrower than the other. It was held by this Court in *Myers* v. *United States, supra,* that " since the foundation of our government, proceedings to punish such offences (contempts of court) have been regarded as *sui generis* and not " criminal prosecutions within the Sixth Amendment, or common understanding." See *Binkley* v. *United States,* 282 Fed. 244; *McCourtney* v. *United States,* 291 Fed. 497; *Ex Parte Terry,* 128 U. S. 289; *Middlebrook* v. *The State,* 43 Conn. 257.

*Sixth.* The Thirteenth Amendment reads: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." *Flannagan* v. *Jepson,* (Iowa) 158 N. W. 641 held that imprisonment alone is not servitude; that hard labor is infamous punishment, and as such cannot be imposed for contempt under the Thirteenth Amendment. See *In re Filki,* 80 Cal. 201.

From a study of the records of the Constitutional Convention, and of the various ratifying conventions, it seems clear that neither the framers of the Constitution nor those who subsequently put it into operation ever thought of contempt of court in connection with the power of pardon granted to the President.

42684°—25——7

Though the clause was liberally debated in the Constitutional Convention, contempts of court were never referred to.

A search of the records of the ratifying conventions, and of the various addresses to the Virginia Convention, fails to disclose that contempts of court were ever touched upon.

The contemporary publications concerning the Constitution between the time of its adoption by the convention and its subsequent ratification, so far as we have been able to ascertain, do not disclose that the subject was ever mentioned.

Furthermore, the record of the Constitutional Convention relating to this pardon provision is confirmatory of the views here expressed.

The pardoning power of the executive cannot be construed to cover contempts of court without encroaching upon the judicial power of the United States, which by the Constitution is vested in the federal courts.

The power to punish for contempt and thereby compel respect for its decrees is an inherent power of the federal courts. It is an essential part of judicial power. *Michaelson* v. *United States*, 266 U. S. 42; *Anderson* v. *Dunn*, 6 Wheat. 204; *Ex parte Terry*, 128 U. S. 289; *Eilenbecker* v. *Dist. Court*, 134 U. S. 31; *Cartwright's Case*, 114 Mass. 230; *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447; *Cooper's Case*, 32 Vt. 253; *In re Debs*, 158 U. S. 564; *Watson* v. *Williams*, 36 Miss. 331; *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418; *Myers* v. *United States*, 264 U. S. 95.

The Judiciary—concededly the weakest of the three coordinate departments of government—must not be obliged to depend on the Executive for the enforcement of its decrees. Such dependence would violate the principle of separation of powers upon which our governmental structure is based.

The pardon of a crime furnishes no analogy. Having sentenced a criminal for violation of a penal statute, the court's work is completed. It is not directly concerned with the execution of the sentence. In the enforcement of its decrees however, the court has a continuing interest. A violation of such decrees is a blow at judicial authority. The pardon of a criminal is an act of mercy. The pardon of contempt is a negation of judicial power.

The situation in England is not analogous. There, government is unitarian in form with the King as its nominal head. In theory at least, and by tradition, it is the King's justice which is dispensed. Here, government is trinitarian, and each of the three departments, legislative, executive and judicial, is supreme in its sphere. Contempt of an English court is contempt of the English King. Contempt of a federal court is not contempt of the President.

Our Judicial Department which checks both President and Congress, holding them within constitutional bounds, is without counterpart in England. The duty imposed is heavy and the responsibility great. The security of the people in the rights guaranteed them by the Constitution and against unconstitutional legislation or unwarranted executive interference is the sole objective. How can it be possible for this Court to discharge the duty thus imposed, if it be conceded that a sentence imposed for disobedience of the orders of this Court, entered, it may be, for the purpose of controlling a tyrannical Executive, may be by such Executive immediately nullified? The doctrine of the separation of powers was early recognized by this Court. *Marbury* v. *Madison* 1 Cranch, 137. See *Kilbourn* v. *Thompson,* 103 U. S. 168; *Evans* v. *Gore,* 253 U. S. 245.

Neither opinions of Attorneys General nor acts of the Executive are determinative (discussing *Ex parte Fisk,* 113 U. S. 713; *The Laura,* 114 U. S. 411; *United States* v. *Wilson,* 7 Pet. 150.)

As with opinions of the law department, there is here no element of contemporaneous construction through pardons granted. The earliest instance disclosed occurred forty years after the Constitution had been adopted.

In the entire list submitted by the Attorney General it is important to note that in only five cases does it affirmatively appear that the pardon issued contrary to the wishes of the court which had imposed the sentence.

Constitutional power in the Executive may not be created merely by acquiescence on the part of the courts. The Judicial Department has not the freedom of action accorded Congress or the President—the rational basis for an estoppel in favor of either and against the Judiciary is therefore lacking. Certainly no estoppel can be claimed to exist before this Court has been called upon to act (discussing *United States* v. *Midwest Oil Co.* 236 U. S. 459).

Contempt of court may not be pardoned without impairing the powers and functions of the court and lessening its respect and authority. *Toledo Newspaper Co.* v. *United States* 247 U. S. 402; *Craig* v. *Hecht,* 263 U. S. 255.

The power of the federal court to compel respect for a decree under the Volstead Act is the same power as has been and should be invoked whenever any decree of that court is defied.

We know of no reason justifying a denial of the pardoning power for contempt of Congress that does not apply with equal or greater force to contempts of court. The power to deal with contempt rests on the right of self-preservation. *Marshall* v. *Gordon,* 243 U. S. 521; *Toledo Newspaper Co.* v. *United States* 247 U. S. 402; Story Const. Vol. 2, (5th Ed.) § 1503.

Congress has power to regulate and restrict, but not to destroy, the power of the courts in contempt cases. It may provide for the amelioration of punishments imposed for contempt. Such congressional control is flexible and useful. This flexibility and usefulness will be destroyed

if the pardoning power of the President is enlarged by construction to include contempts. *Ex parte Robinson,* 19 Wall. 505; *The Laura,* 114 U. S. 411; *United States* v. *Daniels,* 279 Fed. 844.

*Mr. Attorney General Stone,* as *amicus curiae. Mr. Solicitor General Beck* and *Mr. Robert P. Reeder,* Special Assistant to the Attorney General, were also on the brief.

I. The offense for which the petitioner was committed was a criminal contempt; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *Michaelson* v. *United States,* 266 U. S. 42; and the more clearly so because under the National Prohibition Act the fine necessarily accrued to the United States.

II. Criminal contempts are offenses against the United States within the meaning of the Pardon Clause of the Constitution.

This Court has repeatedly treated criminal contempt as an offense criminal in its nature. *Michaelson* v. *United States* 266 U. S. 42; *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402; *Gompers* v. *United States,* 233 U. S. 604; *New Orleans* v. *Steamship Co.,* 20 Wall. 387; *Ex parte Kearney,* 7 Wheat. 38. See also *Bessette* v. *Conkey Co.,* 194 U. S. 324; *Pino* v. *United States,* 278 Fed. 479; *United States* v. *Berry,* 24 Fed. 780; *In re Litchfield,* 13 Fed. 863; *In re Ellerbe,* 13 Fed. 530; *United States* v. *Jacobi,* Fed. Cas. No. 15460; *Fanshawe* v. *Tracy,* Fed Cas. No. 4643. And it is so treated throughout the United States. See *e. g., Sharp* v. *State,* 102 Tenn. 9; *State* v. *Dent,* 29 Kan. 416; *In re Buckley,* 69 Cal. 1; *Williamson's Case,* 26 Pa. St. 9; 13 Corpus Juris, 7.

See the notable series of essays in the Law Quarterly Review: 24 Law Quar. Rev. 184, 266 (1908); 25 *id.* 238, 354 (1909); 36 *id.* 394 (1920); 37 *id.* 191 (1921); 38 *id.* 185 (1922); 40 *id.* 43 (1924); especially 40 *id.* 54, 57, 60. These are summarized in the Harvard Law Review for June, 1924.

It is true that the court has said that criminal contempts are *sui generis* and proceedings for their punishment are not " criminal prosecutions." *Myers* v. *United States*, 264 U. S. 95; but, nevertheless, they constitute offenses against the United States. *State* v. *Magee Publishing Co.*, 29 N. M. 455, 224 Pac. 1028.

Punishment for contempt of court is not imposed out of any personal consideration for the judge, but only to uphold the authority and dignity of the law. While an injured party may condone a disobedience of judicial orders in a civil suit, a court may not condone a criminal contempt, for it constitutes an offense, not against the judge, but against the Government. *In re Rice*, 181 Fed. 217; *State* v. *Sauvinet*, 24 La. Ann. 119; *Ex parte Hickey*, 12 Miss. 751; *State* v. *Magee Publishing Co.*, *supra*; *Sharp* v. *State*, 102 Tenn. 9. See also *In re Ellerbe*, 13 Fed. 530; *In re Mason*, 43 Fed. 510; *Fanshawe* v. *Tracy*, Fed. Cas. No. 4643, 8 Fed. Cas. 997; 13 Corpus Juris, 97.

III. The history of the power to pardon for criminal contempts establishes that, by the grant of the pardoning power to the President by the Constitution, it was intended to embrace criminal contempts in the phrase " offences against the United States."

Except as to cases of treason, there was no substantial objection to the grant of pardoning power. In cases of impeachment the restraint upon the power was made greater than in England. In all other respects the power to pardon offenses against the Government was, as in England, unlimited, and the propriety of this broad grant of power was unquestioned.

In England contempts of court were within the pardoning power of the Crown. The case most frequently cited is that of *Rex* v. *Buckenham* (1665, 1666) 1 Siderfin, 211, 1 Keble, 751, 787, 852. The pardoning power of the King was also recognized in numerous other cases involving contempts of court. *Anonymous* (1674) Cases in

Chancery, 238; *Fulwood* v. *Fulwood* (1584–5) Tothill, 46; *King and Codrington* v. *Rodman* (1631) Cro. Car. 198, W. Jones, 228; *Bartram* v. *Dannett* (1676) Finch, 253; *Phipps* v. *Earl of Anglesea* (1721), 1 P. Williams, 696; Bishop's New Criminal Law, Sec. 913. *Thomas of Chartham* v. *Benet of Stamford* (1313–1314) 24 Selden Society, 185, is also apparently in point.

At one time this power of pardoning contempts extended even to civil contempts (*Young* v. *Chamberlaine,* Tothill, 41); and as even such a contempt as nonperformance of an order in bankruptcy was treated as breach of the peace (*Ex parte Whitchurch* (1749) 1 Atk. 37) it could have been pardoned. Before the adoption of our Constitution, however, civil contempts had been distinguished from criminal contempts. *King* v. *Myers* (1786) 1 Term, 265. Blackstone pointed out (IV, 285) that where contempts and the process thereon were properly the civil remedy of individuals for private injury they were not released or affected by the general act of pardon. Glanville had said (book 7, chap. 17, last sentence): "The King, indeed, is accustomed to remit the pains of forfeiture and outlawry, yet can not he, under color of this prerogative, infringe upon the rights of others." The rule as to civil contempts was apparently an exception to an earlier rule under which all contempts were pardonable. See Hawkins, Pleas of the Crown, 6th ed. published in 1787, II, 549, 553; Blackstone Comm., IV, 398, 399.

Where a pardon was granted to one who had been convicted and fined for maintaining a nuisance, he was not discharged from abatement of the nuisance, for that was a grievance to other persons, but he was discharged from the fine, which was simply a punishment of the offender. *Rex & Regina* v. *Wilcox*, 2 Salkeld, 458.

The pardoning power has substantially the same scope as it had in England when the Constitution was adopted. *Ex parte Wells*, 18 How. 307.

The President may pardon all offenses against the United States except in cases of impeachment. *Ex parte Garland,* 4 Wall. 333.

IV. The power of the President to pardon criminal contempts of court has been repeatedly exercised and has never been challenged heretofore. 2 Op. A. G. 329; 3 *Id.* 622; 4 *Id.* 317; 4 *Id.* 458; 19 *Id.* 476. Unreported opinions of Attorney General Knox in the *McKenzie Case* (May 1, 1901) and of Attorney General Daugherty in the *Craig Case* (Dec. 3, 1923).

Records of the Department of Justice prove that in twenty-seven cases of criminal contempt in addition to these cited the President has pardoned; and probably there have been many others.

The circumstances attending the granting of the pardon have not been uniform. In some cases the records do not show that the judge who imposed the sentence was consulted; in some the judge recommended pardon; in some he refused to make such a recommendation; in two of the cases the Attorney General advised that the pardon be denied. So far as shown by the records and files of the Department of Justice, however, there has not been a single case of criminal contempt of a federal court from the establishment of the Government down to the case now in issue in which any judge or any Attorney General has questioned the power of the President to pardon the contempt; that power has been exercised in many instances; and it has been expressly or impliedly recognized by every Attorney General and every judge who has considered the question in a concrete case.

V. The weight of authority in cases directly involving pardons for contempt of court supports the power of the President to grant this pardon.

Federal judges who had sentenced persons to punishment for contempt of court have in repeated instances recommended the pardoning of those offenders by the

President. One of the judges who did so was Associate Justice McKinley of this Court, 3 Op. A. G. 622.

Another judge who took a similar view of the power of the President was District Judge Blatchford. *In re Mullee,* 7 Blatch. 23, 17 Fed. Cas. 968. Unfortunately he went too far in failing to recognize that where a fine is imposed not by way of punishment but for the benefit of a private party to whom it is to be paid, the rule as to the pardoning of offenses against the United States does not apply. See *Hendryz* v. *Fitzpatrick,* 19 Fed. 810.

See *Ex parte Hickey,* 12 Miss. 751; *State ex rel. Van Orden* v. *Sauvinet,* 24 La. Ann. 119; *Sharp* v. *State,* 102 Tenn. 9.

Of course, the President of the United States does not stand in the same relation to the courts of this country as existed between the King of England and his own courts *except* in so far as that relation was created by our Constitution. But the Constitution does contain an express grant of pardoning power to the President, and this court has said that the words of that grant are to be interpreted as they were understood when they were placed in the Constitution, as giving to the President the same power to grant pardons as had been possessed by the King of England.

The proposition (*In re Nevitt,* 117 Fed. 448) that the judicial power of the United States was granted in its entirety, free from executive control or supervision is untrue; it would exclude all pardoning power whatever.

The President would not be drawing to himself all the real judicial power by a free exercise of the right to pardon offenses any more than he would be drawing to himself all the legislative power by freely pardoning violators of the criminal laws. He would not be exercising any affirmative judicial or legislative power in either case, and he could not exercise such power.

The fair question is, rather, whether he may thwart the exercise of judicial power to punish offenders against the

Government by granting pardons. The answer is that the Constitution does establish a system of checks and that the pardoning power does furnish a potential check upon some judicial actions. If the President abuses this power he may be impeached. It is, however, no more inherently unreasonable that the President should have the power to pardon criminal contempts than that he should have the power to pardon treason.

It is true that a trial for criminal contempt is *sui generis;* it is true that it has been held that our Constitution does not give to the person accused of criminal contempt all of the protection that is given to a person accused of a typical crime; but whether the trial is before a jury or not, the punishment is for an *offense,* and that offense is really against the Government. *Gompers* v. *United States,* 233 U. S. 604. Moreover, it could not properly be said in the *Verage Case,* 177 Wisc. 295, nor in the present case, that the prisoner "interfered with the proper function of an independent branch of government." He did not commit " an offense which tends to frustrate the administration of justice and to interfere with the operation of the courts." His offense was simply a disobedience of a valid order of the court just as the ordinary crime is a disobedience of a valid law.

Courts have recognized that a criminal contempt can not be condoned by the court (*In re Rice,* 181 Fed. 217); that sentence can not be suspended indefinitely (*Ex parte United States,* 242 U. S. 27); and that " in the absence of statute providing otherwise, the general principle obtains that a court can not set aside or alter its final judgment after the expiration of the term at which it was entered, unless the proceeding for that purpose was begun during that term." *United States* v. *Mayer,* 235 U. S. 55, 67. The power to grant pardons has been entrusted to the President and has not been entrusted to the courts.

*Mr. Francis M. Curlee* and *Mr. Charles M. Hay,* by leave of Court, filed a brief as *amici curiae.*

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is an original petition in this Court for a writ of *habeas corpus* by Philip Grossman against Ritchie V. Graham, Superintendent of the Chicago House of Correction, Cook County, Illinois. The respondent has answered the rule to show cause. The facts are not in dispute.

On November 24, 1920, the United States filed a bill in equity against Philip Grossman in the District Court of the United States for the Northern District of Illinois, under Section 22 of the National Prohibition Act (Ch. 85, 41 Stat. 305, 314), averring that Grossman was maintaining a nuisance at his place of business in Chicago by sales of liquor in violation of the Act and asking an injunction to abate the same. Two days later the District Judge granted a temporary order. January 11, 1921, an information was filed against Grossman, charging that, after the restraining order had been served on him, he had sold to several persons liquor to be drunk on his premises. He was arrested, tried, found guilty of contempt and sentenced to imprisonment in the Chicago House of Correction for one year and to pay a fine of $1,000 to the United States and costs. The decree was affirmed by the Circuit Court of Appeals, 280 Fed. 683. In December, 1923, the President issued a pardon in which he commuted the sentence of Grossman to the fine of $1,000 on condition that the fine be paid. The pardon was accepted, the fine was paid and the defendant was released. In May, 1924, however, the District Court committed Grossman to the Chicago House of Correction to serve the sentence notwithstanding the pardon. 1 Fed. (2d) 941. The only

question raised by the pleadings herein is that of the power of the President to grant the pardon.

Special counsel, employed by the Department of Justice, appear for the respondent to uphold the legality of the detention. The Attorney General of the United States, as *amicus curiae,* maintains the validity and effectiveness of the President's action. The petitioner, by his counsel, urges his discharge from imprisonment.

Article II, Section 2, clause one, of the Constitution, dealing with the powers and duties of the President, closes with these words:

". . . and he shall have power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment."

The argument for the respondent is that the President's power extends only to offenses against the United States and a contempt of Court is not such an offense, that offenses against the United States are not common law offenses but can only be created by legislative act, that the President's pardoning power is more limited than that of the King of England at common law, which was a broad prerogative and included contempts against his courts chiefly because the judges thereof were his agents and acted in his name; that the context of the Constitution shows that the word " offences " is used in that instrument only to include crimes and misdemeanors triable by jury and not contempts of the dignity and authority of the federal courts, and that to construe the pardon clause to include contempts of court would be to violate the fundamental principle of the Constitution in the division of powers between the Legislative, Executive and Judicial branches, and to take from the federal courts their independence and the essential means of protecting their dignity and authority.

The language of the Constitution cannot be interpreted safely except by reference to the common law and to

British institutions as they were when the instrument was framed and adopted. The statesmen and lawyers of the Convention who submitted it to the ratification of the Conventions of the thirteen States, were born and brought up in the atmosphere of the common law, and thought and spoke in its vocabulary. They were familiar with other forms of government, recent and ancient, and indicated in their discussions earnest study and consideration of many of them, but when they came to put their conclusions into the form of fundamental law in a compact draft, they expressed them in terms of the common law, confident that they could be shortly and easily understood.

In a case presenting the question whether a pardon should be pleaded in bar to be effective, Chief Justice Marshall said of the power of pardon (*United States* v. *Wilson,* 7 Peters, 150, 160):

"As this power had been exercised, from time immemorial, by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance; we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it."

In *Ex parte William Wells,* 18 Howard, 307, 311, the question was whether the President under his power to pardon could commute a death sentence to life imprisonment by granting a pardon of the capital punishment on condition that the convict be imprisoned during his natural life. This Court, speaking through Mr. Justice Wayne, after quoting the above language of the Chief Justice, said:

" We still think so, and that the language used in the Constitution, conferring the power to grant reprieves and pardons, must be construed with reference to its meaning

at the time of its adoption.   At the time of our separation
from Great Britain, that power had been exercised by the
King, as the chief executive.   Prior to the Revolution, the
Colonies, being in effect under the laws of England, were
accustomed to the exercise of it in the various forms, as
they may be found in the English law books.   They were,
of course, to be applied as occasions occurred, and they
constituted a part of the jurisprudence of Anglo-America.
At the time of the adoption of the Constitution, American
statesmen were conversant with the laws of England and
familiar with the prerogatives exercised by the crown.
Hence, when the words to grant pardons were used in the
Constitution, they conveyed to the mind the authority as
exercised by the English crown, or by its representatives
in the colonies.   At that time both Englishmen and
Americans attached the same meaning to the word pardon.
In the convention which framed the Constitution, no
effort was made to define or change its meaning, although
it was limited in cases of impeachment."

The King of England before our Revolution, in the
exercise of his prerogative, had always exercised the power
to pardon contempts of court, just as he did ordinary
crimes and misdemeanors and as he has done to the pres-
ent day.   In the mind of a common law lawyer of the
eighteenth century the word pardon included within its
scope the ending by the King's grace of the punishment
of such derelictions, whether it was imposed by the court
without a jury or upon indictment, for both forms of
trial for contempts were had.   *Thomas of Chartham* v.
*Benet of Stamford* (1313), 24 Selden Society, 185; *Ful-
wood* v. *Fulwood* (1585), Toothill, 46; *Rex* v. *Buckenham*
(1665), 1 Keble 751, 787, 852; *Anonymous* (1674), Cases
in Chancery, 238; *King and Codrington* v. *Rodman*
(1630), Cro. Car. 198; *Bartram* v. *Dannett* (1676), Finch,
253; *Phipps* v. *Earl of Angelsea* (1721), 1 Peere Williams,
696.

These cases also show that, long before our Constitution, a distinction had been recognized at common law between the effect of the King's pardon to wipe out the effect of a sentence for contempt in so far as it had been imposed to punish the contemnor for violating the dignity of the court and the King, in the public interest, and its inefficacy to halt or interfere with the remedial part of the court's order necessary to secure the rights of the injured suitor. Blackstone IV, 285, 397, 398; Hawkins Pleas of the Crown, 6th Ed. (1787), Vol. 2, 553. The same distinction, nowadays referred to as the difference between civil and criminal contempts, is still maintained in English law. *In the Matter of a Special Reference from Bahama Islands,* Appeal Cases [1893], 138; *Wellesley* v. *Duke of Beaufort,* 2 Russell & Mylne, 639, 667, (where it is shown in the effect of a privilege from arrest of members of Parliament analogous in its operation to a pardon); *In re Freston,* 11 Q. B. D. 545, 552; *Queen* v. *Barnardo,* 23 Q. B. D. 305; *O'Shea* v. *O'Shea and Parnell,* 15 P. & D. 59, 62, 63, 65; Lord Chancellor Selborne in the House of Lords, 276 Hansard, 1714, commenting on *Greene's Case,* 6 Appeal Cases, 657.

In our own law the same distinction clearly appears. *Gompers* v. *Bucks Stove & Range Company,* 221 U. S. 418; *Doyle* v. *London Guarantee Company,* 204 U. S. 599, 607; *Bessette* v. *Conkey Co.,* 194 U. S. 324; *Alexander* v. *United States,* 201 U. S. 117; *Union Tool Co.* v. *Wilson,* 259 U. S. 107, 109. In the *Gompers Case* this Court points out that it is not the fact of punishment but rather its character and purpose that makes the difference between the two kinds of contempts. For civil contempts, the punishment is remedial and for the benefit of the complainant, and a pardon cannot stop it. For criminal contempts the sentence is punitive in the public interest to vindicate the authority of the court and to deter other like derelictions.

With this authoritative background of the common law and English history before the American Revolution to show that criminal contempts were within the understood scope of the pardoning power of the Executive, we come now to the history of the clause in the Constitutional Convention of 1787. The proceedings of the Convention from June 19, 1787 to July 23rd, were by resolution referred to a Committee on Detail for report of the Constitution (II Farrand's Records of Constitutional Convention, 128, 129) and contained the following (II Farrand, 146): " The power of pardoning vested in the Executive (which) his pardon shall not, however, be pleadable to an impeachment." On August 6th, Mr. Rutledge of the Committee on Detail (II Farrand, 185) reported the provision as follows: " He shall have power to grant reprieves and pardons; but his pardon shall not be pleadable in bar of impeachment." This is exactly what the King's pardon was at common law with the same limitation. IV Blackstone, 399. On August 25th (II Farrand, 411), the words " except in cases of impeachment " were added after ".pardons " and the succeeding words were stricken out. On Saturday, September 8th (II Farrand, 547), a committee of five to revise the style of and arrange the articles was agreed to by the House. As referred to the Committee on Style, the clause read (II Farrand, 575): " He shall have power to grant reprieves and pardons except in cases of impeachment." The Committee on Style reported this clause as it now is: " and he shall have power to grant reprieves and pardons for offences against the United States except in cases of impeachment." There seems to have been no discussion over the substance of the clause save that a motion to except cases of treason was referred to the Committee on Style, September 10th (II Farrand, 564), was not approved by the Committee and after discussion was defeated in the Convention September 15th (II Farrand, 626, 627).

We have given the history of the clause to show that the words "for offences against the United States" were inserted by a Committee on Style, presumably to make clear that the pardon of the President was to operate upon offenses against the United States as distinguished from offenses against the States. It can not be supposed that the Committee on Revision by adding these words, or the Convention by accepting them, intended *sub silentio* to narrow the scope of a pardon from one at common law or to confer any different power in this regard on our Executive from that which the members of the Convention had seen exercised before the Revolution.

Nor is there any substance in the contention that there is any substantial difference in this matter between the executive power of pardon in our Government and the King's prerogative. The courts of Great Britain were called the King's Courts, as indeed they were; but for years before our Constitution they were as independent of the King's interference as they are today. The extent of the King's pardon was clearly circumscribed by law and the British Constitution, as the cases cited above show. The framers of our Constitution had in mind no necessity for curtailing this feature of the King's prerogative in transplanting it into the American governmental structures, save by excepting cases of impeachment; and even in that regard, as already pointed out, the common law forbade the pleading a pardon in bar to an impeachment. The suggestion that the President's power of pardon should be regarded as necessarily less than that of the King was pressed upon this Court and was agreed to by Mr. Justice McLean, one of the dissenting Judges, in *Ex parte William Wells*, 18 Howard, 307, 321, but it did not prevail with the majority.

It is said that "Offences against the United States," in the pardon clause can include only crimes and misde-

meanors defined and denounced by Congressional Act,
because of the decision of this Court in *United States* v.
*Hudson,* 7 Cranch, 32. This was a criminal case certi-
fied from the District Court upon a demurrer to an indict-
ment for criminal libel at common law. The Court sus-
tained the demurrer, on the ground that indictments in
federal courts could only be brought for statutory offenses.
The reasoning of the Court was that the inferior courts
of the United States must be created by Congress, that
their jurisdiction, though limited by the Constitution,
was in its nature very indefinite, applicable to a great
variety of subjects, varying in every State in the Union,
so that the courts could not assume to exercise it without
legislative definition. The legislative authority of the
Union must first make an act a crime, affix a punishment
to it and declare the court that shall have jurisdiction of
the offense. The Court admitted that " certain implied
powers must necessarily result to our courts of justice
from the nature of their institution. But jurisdiction of
crimes against the state is not among those powers.
To fine for contempt—imprison for contumacy—enforce
the observance of order, etc., are powers which can not be
dispensed with in a court because they are necessary to
the exercise of all the others and so far our courts no
doubt possess powers not immediately derived from stat-
ute; but all exercise of criminal jurisdiction in common
law cases we are of opinion is not within their implied
powers." The decision was by a majority of the Court
and among the dissenting members was Mr. Justice Story,
who expressed himself with vigor to the contrary in
*United States* v. *Coolidge,* 1 Gall. 488; Fed. Case No.
14,857, which was reversed by a majority of the Court
in 1 Wheat. 415. The *Hudson* decision was made in 1812.
It is not too much to say that, immediately after the rati-
fication of the Constitution, the power and jurisdiction
of federal courts to indict and prosecute common law

crimes within the scope of federal judicial power was thought to exist by most of the then members of this Court. The charge of Chief Justice Jay to the Grand Jury in the United States Circuit Court at Richmond in May, 1793, and the ruling by the United States Circuit Court in *Henfield's case,* Fed. Case No. 6,360; Wharton's State Trials, 49, in which Mr. Justice Wilson and Mr. Justice Iredell constituted the court, sustained this view. Mr. Warren, in his valuable history of this Court, Vol. I, p. 433, says that in the early years of the Court, Chief Justice Ellsworth and Justices Cushing, Paterson and Washington had also delivered opinions or charges of the same tenor. Justices Wilson and Paterson were members of the Constitutional Convention, and the former was one of the five on the Committee on Style which introduced the words " offences against the United States " into the pardon clause. We can hardly assume under these circumstances that the words of the pardon clause were then used to include only statutory offenses against the United States and to exclude therefrom common law offenses in the nature of contempts against the dignity and authority of United States courts, merely because this Court more than twenty years later held that federal courts could only indict for statutory crimes though they might punish for common law contempts.

Nothing in the ordinary meaning of the words " offences against the United States " excludes criminal contempts. That which violates the dignity and authority of federal courts such as an intentional effort to defeat their decrees justifying punishment violates a law of the United States (*In re Neagle,* 135 U. S. 1, 59, *et seq.*), and so must be an offense against the United States. Moreover, this Court has held that the general statute of limitation which forbids prosecutions " for any offense unless instituted within three years next after such offense shall have been committed," applies to criminal contempts.

*Gompers* v. *United States,* 233 U. S. 604.   In that case this Court said (p. 610):

" It is urged in the first place that contempts can not be crimes, because, although punishable by imprisonment and therefore, if crimes, infamous, they are not within the protection of the Constitution and the amendments giving a right to trial by jury &c. to persons charged with such crimes.   But the provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil.   Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth.   *Robertson* v. *Baldwin,* 165 U. S. 275, 281, 282.   It does not follow that contempts of the class under consideration are not crimes, or rather, in the language of the statute, offenses, because trial by jury as it has been gradually worked out and fought out has been thought not to extend to them as a matter of constitutional right.   These contempts are infractions of the law, visited with punishment as such.   If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech.   So truly are they crimes that it seems to be proved that in the early law they were punished only by the usual criminal procedure, 3 Transactions of the Royal Historical Society, N. S. p. 147 (1885), and that at least in England it seems that they still may be and preferably are tried in that way.   See 7 Halsbury, Laws of England, 280, sub. *v.* Contempt of Court (604); *Re Clements* v. *Erlanger,* 46 L. J., N. S., pp. 375, 383.   *Matter of Macleod,* 6 Jur. 461.   *Schreiber* v. *Lateward,* 2 Dick. 592.   *Wellesley's Case,* 2 Russ. & M. 639, 667.   *In re Follard,* L. R. 2 P. C. 106, 120.   *Ex parte Kearney,* 7 Wheat. 38, 43.   *Bessette* v. *W. B. Conkey Co.,* 194 U. S. 324, 328, 331, 332.   *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 441."

The recent case of *Michaelson* v. *United States* fully bears out the same view. 266 U. S. 42, 66, 67.

It is said, however, that whatever may be the scope of the word " offenses " in the particular statute construed in the *Gompers Case,* its association in the Constitution is such as to show a narrower meaning. The word "offences " is only used twice in the original Constitution, once in the pardon clause, and once in Article I, Section 8, among the powers of Congress " to define and punish Piracies and Felonies committed on the high seas and offences against the Law of Nations." In the amendments, " offence " occurs but once and that in the Fifth Amendment in the clause forbidding double jeopardy. We do not see how these other two uses of the word can be said to limit the meaning of " offences " in the pardon clause.

The argument is that the word " offences " is used in the Constitution interchangeably with *crimes* and *criminal prosecutions.* But as has been pointed out in *Shick* v. *United States,* 195 U. S. 65, the term " offences " is used in the Constitution in a more comprehensive sense than are the terms " crimes " and " criminal prosecutions." In *Myers* v. *United States,* 264 U. S. 95, 104, 105, we have but recently held that " while contempt may be an offense against the law and subject to appropriate punishment, certain it is that since the foundation of our Government proceedings to punish such offenses have been regarded as *sui generis* and not criminal prosecutions within the Sixth Amendment or common understanding." *Bessette* v. *Conkey Co.,* 194 U. S. 324, 326. Contempt proceedings are *sui generis* because they are not hedged about with all the safeguards provided in the bill of rights for protecting one accused of ordinary crime from the danger of unjust conviction. This is due, of course, to the fact that for years before the American Constitution, courts had been held to be inherently empowered

to protect themselves and the function they perform by summary proceeding without a jury to punish disobedience of their orders and disturbance of their hearings. So it is clear to us that the language of the Fifth and Sixth Amendments and of other cited parts of the Constitution are not of significance in determining the scope of pardons of "offences against the United States" in Article II, Section 2, clause 1, of the enumerated powers of the President. We think the arguments drawn from the common law, from the power of the King under the British Constitution, which plainly was the prototype of this clause, from the legislative history of the clause in the Convention, and from the ordinary meaning of its words, are much more relevant and convincing.

Moreover, criminal contempts of a federal court have been pardoned for eighty-five years. In that time the power has been exercised twenty-seven times. In 1830, Attorney General Berrien, in an opinion on a state of fact which did not involve the pardon of a contempt, expressed merely in passing the view that the pardoning power did not include impeachments *or contempts,* using Rawle's general words from his work on the Constitution. Examination shows that the author's exception of contempts had reference only to contempts of a House of Congress. In 1841, Attorney General Gilpin approved the pardon of a contempt on the ground that the principles of the common law embraced such a case and this Court had held that we should follow them as to pardons. (3 Op. A. G. 622.) Attorney General Nelson in 1844 (4 Op. A. G. 317), Attorney General Mason in 1845 (4 Op. A. G. 458), and Attorney General Miller in 1890 (19 Op. A. G. 476), rendered similar opinions. Similar views were expressed, though the opinions were not reported, by Attorney General Knox in 1901 and by Attorney General Daugherty in 1923. Such long practice under the pardoning power and acquiescence in it strongly

sustains the construction it is based on. *Stuart* v. *Laird,*
1 Cranch, 299, 308; *Cooley* v. *Board of Wardens,* 12
How. 299, 315; *Lithographic Company* v. *Sarony,* 111
U. S. 53, 57; *The Laura,* 114 U. S. 411, 416.

Finally, it is urged that criminal contempts should not
be held within the pardoning power because it will tend
to destroy the independence of the judiciary and violate
the primary constitutional principle of a separation of the
legislative, executive and judicial powers. This argument
influenced the two district judges below. (1 Fed. (2d)
941.) The Circuit Court of Appeals of the Eighth Circuit
sustained it in a discussion, though not necessary to the
case, in *In re Nevitt,* 117 Fed. 448. The Supreme Court
of Wisconsin by a majority upheld it in *State ex rel. Rodd*
v. *Verage,* 177 Wis., 295, in remarks which were also
*obiter. Taylor* v. *Goodrich,* 25 Texas Civil App., 109, is
the only direct authority, and that deals with a clause a
little differently worded. The opposite conclusion was
reached in *In re Mullee,* 7 Blatchford, 23; *Ex parte
Hickey,* 12 Miss. 751; *Louisiana* v. *Sauvinet,* 24 La. Ann.
119; *Sharp* v. *State,* 102 Tenn. 9; *State* v. *Magee Publishing Company,* 29 New Mexico 455.

The Federal Constitution nowhere expressly declares
that the three branches of the Government shall be kept
separate and independent. All legislative powers are
vested in a Congress. The executive power is vested in
a President. The judicial power is vested in one Supreme
Court and in such inferior courts as Congress may from
time to time establish. The Judges are given life tenure
and a compensation that may not be diminished during
their continuance in office, with the evident purpose of
securing them and their courts an independence of Congress and the Executive. Complete independence and
separation between the three branches, however, are not
attained, or intended, as other provisions of the Constitution and the normal operation of government under it

easily demonstrate. By affirmative action through the veto power, the Executive and one more than one-third of either House may defeat all legislation. One-half of the House and two-thirds of the Senate may impeach and remove the members of the Judiciary. The Executive can reprieve or pardon all offenses after their commission, either before trial, during trial or after trial, by individuals, or by classes, conditionally or absolutely, and this without modification or regulation by Congress. *Ex parte Garland,* 4 Wall. 333, 380. Negatively, one House of Congress can withhold all appropriations and stop the operations of Government. The Senate can hold up all appointments, confirmation of which either the Constitution or a statute requires, and thus deprive the President of the necessary agents with which he is to take care that the laws be faithfully executed.

These are some instances of positive and negative restraints possibly available under the Constitution to each branch of the government in defeat of the action of the other. They show that the independence of each of the others is qualified and is so subject to exception as not to constitute a broadly positive injunction or a necessarily controlling rule of construction. The fact is that the Judiciary, quite as much as Congress and the Executive, is dependent on the coöperation of the other two, that government may go on. Indeed, while the Constitution has made the Judiciary as independent of the other branches as is practicable, it is, as often remarked, the weakest of the three. It must look for a continuity of necessary coöperation, in the possible reluctance of either of the other branches, to the force of public opinion.

Executive clemency exists to afford relief from undue harshness or evident mistake in the operation or enforcement of the criminal law. The administration of justice by the courts is not necessarily always wise or certainly considerate of circumstances which may properly mitigate

guilt. To afford a remedy, it has always been thought essential in popular governments, as well as in monarchies, to vest in some other authority than the courts power to ameliorate or avoid particular criminal judgments. It is a check entrusted to the executive for special cases. To exercise it to the extent of destroying the deterrent effect of judicial punishment would be to pervert it; but whoever is to make it useful must have full discretion to exercise it. Our Constitution confers this discretion on the highest officer in the nation in confidence that he will not abuse it. An abuse in pardoning contempts would certainly embarrass courts, but it is questionable how much more it would lessen their effectiveness than a wholesale pardon of other offenses. If we could conjure up in our minds a President willing to paralyze courts by pardoning all criminal contempts, why not a President ordering a general jail delivery? A pardon can only be granted for a contempt fully completed. Neither in this country nor in England can it interfere with the use of coercive measures to enforce a suitor's right. The detrimental effect of excessive pardons of completed contempts would be in the loss of the deterrent influence upon future contempts. It is of the same character as that of the excessive pardons of other offenses. The difference does not justify our reading criminal contempts out of the pardon clause by departing from its ordinary meaning confirmed by its common law origin and long years of practice and acquiescence.

If it be said that the President, by successive pardons of constantly recurring contempts in particular litigation, might deprive a court of power to enforce its orders in a recalcitrant neighborhood, it is enough to observe that such a course is so improbable as to furnish but little basis for argument. Exceptional cases like this, if to be imagined at all, would suggest a resort to impeachment rather than to a narrow and strained construction of the general powers of the President.

The power of a court to protect itself and its usefulness by punishing contemnors is of course necessary, but it is one exercised without the restraining influence of a jury and without many of the guaranties which the bill of rights offers to protect the individual against unjust conviction. Is it unreasonable to provide for the possibility that the personal element may sometimes enter into a summary judgment pronounced by a judge who thinks his authority is flouted or denied? May it not be fairly said that in order to avoid possible mistake, undue prejudice or needless severity, the chance of pardon should exist at least as much in favor of a person convicted by a judge without a jury as in favor of one convicted in a jury trial? The pardoning by the President of criminal contempts has been practiced more than three-quarters of a century, and no abuses during all that time developed sufficiently to invoke a test in the federal courts of its validity.

It goes without saying that nowhere is there a more earnest will to maintain the independence of federal courts and the preservation of every legitimate safeguard of their effectiveness afforded by the Constitution than in this Court. But the qualified independence which they fortunately enjoy is not likely to be permanently strengthened by ignoring precedent and practice and minimizing the importance of the coördinating checks and balances of the Constitution.

The rule is made absolute and the petitioner is discharged.