Ruth Reynolds, on behalf of Pedro Albizu Campos, Plaintiff and Appellant, *v.* Gerardo Delgado, Warden of the State Penitentiary, Defendant and Appellee.

No. AP-63-41.     Decided November 10, 1964.

*Conrad J. Lynn* and *Carlos Carrera Benítez* for petitioner and appellant. *J. B. Fernández Badillo, Solicitor General, Irene Curbelo, Manuel J. Vera Mercado, Alcides Oquendo Maldonado,* and *J. F. Rodríguez Rivera, Assistant Solicitors General,* for defendant and appellee.

MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of the Court.

On September 30, 1953, the Governor of the Commonwealth of Puerto Rico granted to Pedro Albizu Campos—who had been convicted and sentenced for the commission of several offenses against the laws of Puerto Rico—a conditional pardon conceived in the following terms:

"To whom it may concern:

"WHEREAS, Pedro Albizu campos was convicted and sentenced in the Superior Court of San Juan, Puerto Rico, San Juan Part, in 1951 for several offenses in cases No. F-2796 (Assault to Commit Murder); M-6336 (Violation of Section 12 —Act No. 67 of May 13, 1934, as amended); M-6341 (Non-registration of Firearms); M-6338 (Non-registration of Firearms); M-6340 (Non-registration of Firearms); M-6337 (Violation of Section 11—Act No. 67 of May 13, 1934, as amended);

F-2795 (Violation of Act No. 53 of June 10, 1948, as amended), part of said sentences not being yet served;

"WHEREAS, in view of the poor health and advanced age of the prisoner, I consider this case as fit for the exercise of executive grace;

"THEREFORE, I, LUIS MUÑOZ MARÍN, Governor of the Commonwealth of Puerto Rico, by virtue of the authority vested in me by the Constitution of Puerto Rico, do hereby grant unto him, the said Pedro Albizu Campos, a pardon of the offenses of which he was convicted, relieving him from serving the rest of the sentences in the aforementioned cases and restoring to him all his civil rights and prerogatives under the Constitution of the Commonwealth of Puerto Rico, all the foregoing being subject to the condition of a summary revocation of this pardon should Pedro Albizu Campos attempt or plot against the public order, intending to subvert by violence or terror, the existing constitutional order established and disregard the will of the People of Puerto Rico democratically expressed by its vote.

"Should this pardon be summarily revoked, Pedro Albizu Campos may file in the courts of the country a petition for Habeas Corpus to question the determination of nonperformance on his part of the condition annexed herein.

"Nothing in this proclamation shall be construed as a limitation of the freedom of speech of Pedro Albizu Campos, if he so desires, to struggle, through constitutional and democratic means, for the independence of Puerto Rico, or for any other causes which interest him.

"In witness whereof, I have hereunto affixed my signature and the Great Seal of the Commonwealth of Puerto Rico, in the city of San Juan, on this date, September 30, 1953.

(s) LUIS MUÑOZ MARÍN
Governor"[1]

---

[1] The sentences imposed on Albizu by the Superior Court, San Juan Part, to which reference is made in the pardon document copied above were the following: of 7 to 15 years' imprisonment in the penitentiary for the offense of attempt to commit murder, rendered on March 16, 1951 in case F-2796; two and one-half years in jail for a violation of § 12 of Act No. 67 of May 13, 1934 (Sess. Laws, p. 458), rendered on February 20, 1951 in case M-6336; six years' imprisonment in jail for a violation of § 11 of Act No. 67 of May 13, 1934, rendered on the same date in case

The nature of the previous pardon was examined by this Court in *People* v. *Albizu*, 77 P.R.R. 843 (1955). Regarding the reservation of *summary revocation* contained therein, "should Pedro Albizu Campos attempt or plot against the public order, intending to subvert by violence or terror the existing constitutional order established, and disregard the will of the people of Puerto Rico democratically expressed by its vote," we said at p. 849:

". . . This condition, although implicit in the obligation of every citizen to obey the law, was imposed on appellant precisely because he was being pardoned of the effects of similar acts—violation of Act No. 53 of June 10, 1948, as amended—which condition was not illegal, immoral, or impossible of performance. Appellant accepted the pardon under that condition. The proclamation of pardon itself provided the way in which, should there be cause for revocation according to the reservation made, the prisoner could question 'the determination of nonperformance on his part of the condition annexed herein'; by filing in court a petition for Habeas Corpus. And in order to place the scope of the condition imposed in its proper sphere —precisely because he was being pardoned, among others, of

M-6337; nine months' imprisonment in jail, one year in jail, and six months in jail, all for possession of unregistered firearms, rendered on February 20, 1951 in cases M-6338, M-6340, and M-6341. The foregoing judgments were rendered for acts which occurred during the week of October 30, 1950, when the abortive Nationalist revolt took place in Puerto Rico.

The pardon comprised also covered two sentences (totalling 54 years' imprisonment) imposed on Albizu in case F-2795 for an equal number of violations of Act No. 53 of June 10, 1948, as amended by Act No. 9 of August 19, 1948, 33 L.P.R.A. § 1471 *et seq.*—an act which made it an offense, among others, to promote, advocate, advise or preach, wilfully or knowingly, the duty, necessity, desirability, or expediency of overthrowing, paralyzing, or subverting the Government of Puerto Rico or any political subdivision thereof, by means of force or violence. This Act was repealed in its entirety by Act No. 2 of August 5, 1957 (Sp. Sess. Laws, p. 516), following recommendation ·of the Civil Rights Committee created by the Governor to study the state of the civil rights in Puerto Rico. On December 30, 1959, the Governor granted another pardon to Albizu, but this time he limited the effects thereof exclusively to the 12 sentences imposed in case F-2795.

a violation of the aforecited Act No. 53—and make evident, under said condition, the meaning of the rights which he was restoring, the Governor expressly stated that nothing in the proclamation of pardon should be construed 'as a limitation of the freedom of speech of Pedro Albizu Campos, if he so desires, to struggle, through constitutional and democratic means, for the independence of Puerto Rico, or for any other causes which interest him.' "

On March 6, 1954, the Governor revoked[2] the pardon granted to Albizu five months prior thereto, and on that same day he was recommitted to prison in order to continue serving his sentences.[3]

---

[2] Although the revocation document is copied in the opinion delivered on May 12, 1964 in this same case, we deem it desirable to copy it here again:

"To whom it may concern:

"WHEREAS, on September 30, 1953, I granted Pedro Albizu Campos a pardon of the offenses of which he was convicted and sentenced in the year 1951, subject to a summary revocation of that pardon should the aforesaid Pedro Albizu Campos attempt or plot against the public order, intending to subvert by violence or terror the existing constitutional order established and disregard the will of the people of Puerto Rico democratically expressed by its votes;

"WHEREAS, Pedro Albizu Campos has violated the conditions of his pardon;

"THEREFORE, I, Luis Muñoz Marín, Governor of the Commonwealth of Puerto Rico, do hereby revoke, cancel, and annul the conditional pardon granted to Pedro Albizu Campos on September 30, 1953.

"The Chief of Police of Puerto Rico is likewise ordered to immediately arrest Pedro Albizu Campos and to take him to an institution designated by the Secretary of Justice in order that he may serve the remainder of the sentences.

"In witness whereof, I have hereunto affixed my signature and the Great Seal of Puerto Rico, in the city of San Juan, on this date, March 6, 1954.

GREAT SEAL OF PUERTO RICO

(s) LUIS MUÑOZ MARÍN"

[3] It was not until November 13, 1956—2 years and 8 months after the revocation of the pardon—that Conrad J. Lynn, an attorney at law of New York, filed a petition in the District Court of the United States for the District of Puerto Rico for the purpose of inquiring on the legality of Albizu's detention. The petition was denied on the ground that Albizu had failed to resort first to the courts of the Commonwealth in order to

On September 18, 1962, Ruth Reynolds, an American resident in New York but closely connected with Albizu Campos—according to her own statements in this petition—and with the Nationalist movement headed by him, see *People* v. *Reynolds*, 77 P.R.R. 421 (1954), filed in this Court a petition for habeas corpus,[4] sworn to in New York before Notary Conrad J. Lynn.[5] The proceedings had in the Superior Court[6] upon executing the writ which we issued, and the disposition which on appeal we made of the procedural questions raised in the petition in the trial court, appear explicitly in our opinion of May 12 of the present year. Let us examine at this time the two basic questions on which

---

assert his right to question the revocation of the pardon. See *Lynn* v. *Delgado*, 145 F.Supp. 906. Lynn did nothing at the time. Almost *five years* elapsed, and on September 12, 1961, a citizen resident in Raymond, New Hampshire, named Arthur Harvey, a farmer, as set forth in the jurat of his petition—but whom petitioner herein labelled "indigent" in her petition—came to Puerto Rico and filed in this Court a petition for habeas corpus on behalf of Pedro Albizu Campos, a writ having been issued on the 18th of that month to be executed before the Superior Court, San Juan Part. That court having dismissed his petition "when Harvey failed to establish that he was authorized by the prisoner to file it on his behalf" (n. 6 of our opinion of May 12), Harvey took no further action since, according to petitioner, "being indigent on that date and having no resources, he was compelled to return to the continental United States."

[4] This petition is identical in its contentions with that filed by Harvey one year prior thereto.

[5] On September 24, 1962, as a matter of courtesy to Lynn, we authorized him, under Rule 8(d) of this Court, to represent the petitioner in this appeal before the Superior Court. Subsequently we authorized him to appear before this Court on appeal, and excused his noncompliance with the size and form of the briefs which he had already presented without conforming to our Rules.

[6] Lynn's lack of familiarity with the procedures of the local law unquestionably led him unnecessarily to delay the appeal of his client from the adverse order of the Superior Court dismissing the appeal without considering the same on the merits, by following the procedure for perfecting the same by the preparation of a transcript which he did not need in order to send up the record on appeal to this court and to make the procedural issues raised by him in the trial court, which dealt exclusively with the sufficiency of the return and of the traverse and its consequences. No evidence was heard before that court.

petitioner rests her contention of illegality of Albizu's detention.

## I

### *Summary Revocation of the Pardon Without Previous Hearing and the Due Process of Law*

Petitioner's contention in this petition has been that if the pardon had provided for a hearing prior to recommitment by reason of some violation of the conditions imposed therein, the pardon would have met the requirements of due process of law;[7] that Albizu was deprived of his liberty without the due process of law because the pardon was revoked and he was recommitted without a hearing, and also that his imprisonment is illegal because he was arrested without the warrant for his detention having been issued by any court or judicial authority, or otherwise provided by law. Although petitioner concedes that although in the exercise of his pardoning power the Governor had the right to impose conditions, particularly those contained in Albizu's

---

[7] The case of *Escoe* v. *Zerbst*, 295 U.S. 490, 79 L.Ed. 1566 (1935), cited by petitioner to maintain that the disposition on summary revocation of the pardon violated the due process of law, does not support her contention. In that case the Court revoked a suspended sentence under the Federal Probation Act of March 4, 1925, 18 U.S.C. §§ 724–27, which provided in § 725 that at any time within the probation period the court may issue a warrant for the arrest of the accused *and that he shall forthwith be taken before the court,* and that thereupon the court may revoke the probation and impose any sentence which might originally have been imposed.

The order issued by the court *did not provide that the probationer be taken before the court,* but revoked the probation and *ordered that he be committed to prison* to serve the stated sentence. Upon the failure to follow the procedure provided by the statute, the revocation was considered invalid. It was when considering the words and explaining the purpose of the statutory provision ordering the appearance before the court that it was said, through Mr. Justice Cardozo, that it was clearly "to enable an accused probationer to explain away the accusation." The contention that the opportunity to be heard had its basis in the Constitution, apart from the statute, was rejected by the Court. See, also, *Burns* v. *United States*, 287 U.S. 216, 77 L.Ed. 266.

pardon,[8] she alleges that in ordering the summary revocation, without hearing him before recommitment, the Governor disregarded the requirements of the due process of law which he is bound to observe since he was acting in the field of constitutional powers, not of sovereign arbitrary powers, and was not performing an act of grace to the pardonee. The latter assertion turns on the words of Mr. Justice Holmes in the case of *Biddle* v. *Perovich*, 274 U.S. 480, 486, 71 L.Ed. 1161, 1163, which we shall examine later.

The clear and precise terms of the conditions under which the pardon was granted in this case do not leave, cannot leave, room for the contentions on which petitioner bases her challenge of the Governor's action revoking the same and its consequences, the recommitment. As we have already seen from the text itself, the Governor, based on the poor health and advanced age of Albizu, and considering that it was a proper case for the exercise of executive clemency, by virtue of the authority vested in him by the Constitution of the Commonwealth of Puerto Rico[9] absolved him from all the offenses of which he had been convicted, *relieving him from serving the rest* of all the sentences imposed and restoring all his civil rights and prerogatives under our Constitution, all of the foregoing being subject to the express reservation of *summary revocation* should Albizu attempt or plot against the public order, intending to subvert by violence or terror the existing constitutional order established, and disregard the will of the people of Puerto Rico democratically expressed by its vote. By disposition of the Governor himself, this reser-

---

[8] At the hearing held February 12, 1964, Lynn made the following assertion: "We do not question the Governor's right to impose conditions, that he had the right to impose these conditions which he imposed on . . . ."

[9] Article IV, § 4, par. 8: "He shall have the power to suspend the execution of sentences in criminal cases and to grant pardons, commutations of punishment, and total or partial remissions of fines and forfeitures for crimes committed in violation of the laws of Puerto Rico. This power shall not extend to cases of impeachment."

vation of summary revocation was subject in turn to the subsequent proceeding of judicial review by habeas corpus respecting his determination of breach by Albizu of the condition imposed. It is evident that in providing that the judicial review of his own action be by habeas corpus, the Governor not only reaffirmed his disposition that the judicial review of his determination of breach of condition be a proceeding subsequent to the revocation, but actually proclaimed in the pardon itself that Albizu's status would return to that of prisoner as immediate result of the revocation, so that his right would then arise to question such determination. That is, in fact, the meaning of the reference to the petition for habeas corpus, since by virtue of the limited scope to which the judicial review of the executive action is inherently subject [10]—to determine whether it was arbitrary or unreasonable—habeas corpus indeed ceases to be such remedy because it loses its intrinsic virtuality of collateral attack and acquires the true nature of the remedy of limited judicial review.[11]

We reiterate here what was said in *People* v. *Albizu, supra,* on the scope and conditional nature of the pardon granted and on the effects of its acceptance. A pardon is an act of executive clemency which does not form part in itself of the criminal process which culminates in the accused's conviction. A convict enjoys it, not as a part of any right recognized to him by the existing juridical order, but by the grant of a grace[12] by the executive power. The fact that in this jurisdiction the pardoning power flows from our Constitution—*Emanuelli* v. *District Court,* 74

---

[10] Hochman, *Judicial Review of Administrative Processes, etc.,* 74 Harv. L. Rev. 684; Fahy, *Judicial Review of Executive Action,* 50 Geo. L.J. 709.

[11] *Federal Habeas Corpus Review of "Final" Administrative Decisions,* 56 Colum. L. Rev. 551.

[12] In the same case of *Escoe* v. *Zerbst, supra,* the conditional pardon is labelled an act of executive grace.

P.R.R. 506, 513 (1953)—does not deprive the Governor of authority, in granting pardons, to impose such conditions as in his judgment the public interest so requires, provided such conditions—as we said in *People* v. *Albizu*, *supra*, following the prevailing doctrine on which there is no discrepancy—are not illegal, immoral, or impossible of performance.[13]

The words of Mr. Justice Holmes in *Biddle* v. *Perovich*, *supra*, which petitioner emphasizes in order to allege that the condition of summary revocation of the pardon is invalid because it deprived the pardonee of an opportunity to be heard before the revocation, do not have the scope attributed to them, nor support her point of view that the acceptance of the pardon with that condition did not bind the pardonee to its performance. These are the words of Mr. Justice Holmes: "A pardon in our days is not a private act of grace from an individual happening to possess power. It is a part of the constitutional scheme. When granted, it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed. See *Ex parte Grossman*, 267 U.S. 87, 120, 121, 69 L.Ed. 527, 535, 38 A.L.R. 131, 45 Sup. Ct. Rep. 332. Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will, whether he liked it or not, the public welfare, not his consent, determines what shall be done." 274 U.S. 486, 71 L.Ed. 1163.[14]

---

[13] See notes in 24 Minn. L. Rev. 584 and 6 Fordham L. Rev. 255, 262, 341.

[14] In this case the defendant was convicted of murder and sentenced to suffer death in Alaska, and the President commuted his sentence to that of life imprisonment "in a penitentiary to be designated by the Attorney General of the United States." Accordingly, he was transferred from the jail in Alaska to the penitentiary at Leavenworth in Kansas. Several years later he filed a petition for habeas corpus alleging that his transfer from

Under the same philosophy underlying the foregoing comments of Mr. Justice Holmes, it should be borne in mind in this case that although the grant of the pardon to Albizu may be considered as a determination of the Governor—as the highest authority in matter of pardons—that the public welfare was better served, it was also a coetanous determination of the Governor himself that the public welfare would not be so well served if he did not reserve the power to revoke summarily the pardon, should Albizu engage in any of the acts the commission of which the Governor wished to discourage by the condition annexed therein, and which, by its very nature, tended in turn to protect the true general welfare of the community: the public order, the constitutional order established, and the democratic will expressed by the people by its vote. In imposing the condition for the pardon, the Governor could not disregard the past history of the pardonee in connection with former acts similar in nature to those which could bring about the revocation and for which he had been previously convicted.[15]

■ Under the conditions annexed in the pardon document, the question of lack of due process cannot arise here because, apart from the reservation of summary revocation contained in the pardon itself, *People* v. *Albizu, supra,* and Weinhofen, *Revoking Probation, Parole or Pardon Without a Hearing,* 32 J. Crim. L. & Cr. 531, 532, n. 8, in this case provision was expressly made for judicial review in the event the pardon was summarily revoked.

■■ In *Fleenor* v. *Hammond,* 116 F.2d 982 (6th Cir. 1941), it was held that under the terms of the conditional pardon involved therein, the right of a pardonee to enjoy

---

a jail to a penitentiary and the order of the President had been made without his consent and were without legal authority. The Federal Supreme Court, speaking through Mr. Justice Holmes, held that the President may commute a sentence without the convict's consent.

[15] *Albizu* v. *United States,* 88 F.2d 138.

his liberty could not be revoked without the opportunity to be heard which is usually incidental to the due process, provided the revocation was challenged under the unequivocal allegations that petitioner had complied with the conditions of the pardon. It is well to note, however, that in that case the Governor did not provide in the pardon for judicial review in reserving the power of revocation thereof, and that the general doctrine in state jurisdictions is that, where the right to hearing and judicial review of the determination of nonperformance of the conditions of a pardon is recognized, due process is considered fulfilled if the pardonee is given an opportunity to be heard through a petition for habeas corpus. See *Pardon and Parole—Necessity of Due Process to Revoke*, 24 Minn. L. Rev. 584 *et seq.* In view of the nature of the executive grace exercised herein and the terms and conditions under which the pardon was conceived and accepted, it cannot be alleged that there is lack of due process in the mechanism of that document in the event of revocation on the ground of nonperformance of the condition imposed therein.

██ In consonance with the nature of the act of executive clemency with which Albizu was favored, and in accordance with the terms and conditions of the pardon, the Governor, based on the violation of the conditions imposed, revoked, cancelled, and declared the same invalid, and accordingly ordered the arrest and immediate recommitment of Albizu to the institution to be designated by the Secretary of Justice to continue serving the rest of the sentences.[16]

---

[16] Although the power to order his recommitment to prison was incidental to and a consequence of his power to revoke the pardon, according to the conditions annexed therein, it must be observed that under § 11 of Act No. 266 of April 4, 1946, 4 L.P.R.A. § 610, a person conditionally released by the Governor shall remain "under the legal custody of the Governor of Puerto Rico, who may, on recommendation of the board, or in his discretion, cancel the order of conditional release to which this section refers, and order said person confined in the institution he was

The provisions of our Constitution that "No warrant for arrest . . . shall issue except by judicial authority and only upon probable ·cause supported by oath or affirmation"[17] does not apply in this case, since we are not concerned here with a determination of probable cause for the arrest of a citizen before conviction in a criminal case, but with a highly discretional administrative determination made by the Executive in the first instance revoking a conditional pardon to a convict, in the exercise of his constitutional power, pursuant to the terms of the very document on which the former asserts herein the right to liberty invoked. As to this determination of the Executive, there is no constitutional provision limiting the exercise of his power to grant conditional pardons, or requiring, as a matter of due process of law, either a previous hearing for their revocation under the circumstances of this case, or the determination of the judicial authority for recommitment incidental to the revocation.

Consequently, the first of the two contentions made by petitioner is dismissed.

## II

*Sufficiency of the Evidence for Revocation of the Pardon*

Petitioner alleged in her petition that Albizu's detention was illegal because the revocation of the conditional pardon was made without the pardonee having breached the conditions imposed therein. In our former opinion in this case, and in a desire to examine at the same time the legality of Albizu's detention, we disregarded all vestiges of procedural

released from, so that he may serve the unextinguished part of his sentence." *Cf. In re Saucier*, 167 A.2d 368 (1961); *In re Charizio*, 138 A.2d 430 (1958); *State ex rel. Murray* v. *Swenson*, 76 A.2d 150 (1950).

This action refers to "the granting of any form of executive clemency and pardon," to be granted by the Governor, as distinguished from liberty on parole to be granted by the Board under the other provisions of that Act.

[17] Article II, § 10, par. 3.

refinement and deemed incorporated in the traverse the denial made in the petition respecting the breach of the conditions of the pardon, basing our determination on the averment of the traverse that "Petitioner denies the existence of facts to support such conclusions of law." That has been her position on the sufficiency of the evidence heard in this appeal to justify the revocation of the pardon by the Governor.

The day of the hearing before this Court the defendant presented an amended return, and also, in the course thereof, he moved for and obtained leave to make an additional amendment which he formulated orally and then submitted in writing.

Petitioner in turn made the following admissions of the averments of the return with the exception that, although she admitted the occurrence of the acts therein alleged, the same were not relevant in the case for the purpose of determining the legality of Albizu's detention, her position throughout the entire proceeding being that only evidence of the acts occurring between September 30, 1953—date of the pardon—and the evening of March 5, 1954, when the same was revoked, was pertinent and admissible:

"(a) After he was released by virtue of the pardon granted on September 30, 1953, Pedro Albizu Campos established his residence in the general headquarters of the group known as 'Nationalist Party of Puerto Rico,' resumed his functions as leader of that group, and in that capacity he continued directing the activities thereof.[18]

---

[18] Petitioner also maintained that the following matter which was made a part as a footnote of paragraph (a) copied above, *Guadalupe* v. *Bravo, Warden,* 71 P.R.R. 913 (1950), was irrelevant:

"For years there has been in this Island a separatist movement fostered by a group of individuals, intended to bring about the independence of Puerto Rico from the United States by force and violence. Proof of this is that in *Albizu* v. *United States,* 88 F.2d 138 (C.C.A. 1, 1937), upon reviewing on appeal a judgment of the United States District Court for Puerto Rico against a group of Nationalist leaders for conspiracy to overthrow by force and violence the United States Government in Puerto

"(b) On March 1, 1954, members of the Nationalist Party of Puerto Rico, to wit: Lolita Lebrón, Rafael Cancel Miranda, Andrés Figueroa Cordero, and Irving Flores, carried out a shooting in the House of Representatives of the United States of America, in which Congressmen Alvin M. Bentley, Ben F. Jensen, Kenneth A. Roberts, Clifford Davis, and George H. Fallon were injured.[19]

Rico, the Court of Appeals for the First Circuit, after reciting the evidence introduced, said:

'There was much evidence of shooting and other violence in which members of the Nationalist Party were engaged that was clearly the result of the incendiary and revolutionary speeches of Albizu and of the matter published in La Palabra by Corretjer, and in the other papers referred to, particularly in Armas published by the defendant Vélez [referring to Clemente Soto Vélez] and in accordance with the resolutions adopted at the convention at Caguas on December 8, 1935.'

"We take judicial notice of the events of the week of October 30, 1950 —De Castro v. Board of Commissioners, 59 P.R.R. 673; People v. Torregrosa, 57 P.R.R. 759—which culminated in Concurrent Resolution No. 1 of the Legislative Assembly of Puerto Rico of November 8, 1950, of which we also take judicial notice. Said resolution recites:

WHEREAS, as a result of such tactics, members of the Nationalist group attacked the official residence of the Governor of Puerto Rico on Monday, October 30, with the intent to assassinate the Governor, and within the following 72 hours members of the Nationalist group attacked police stations, burned houses, opened fire on hospitals, and carried their campaign of tragic, suicidal mania as far as the national capital in an attempt to assassinate President Truman; . . . .'"

[19] She maintained further that the following Joint Resolution of the Senate of Puerto Rico, No. 22 of March 1, 1954, which was made a part as a footnote of paragraph (b) copied above, was irrelevant:

"Dispatches are being received this moment from Washington informing that a group of persons entered the floor of the House of Representatives of the United States and treacherously attacked the members of that high body assembled therein, as a result of which distinguished members of the Congress of the United States have been injured. The assailants have been identified as affiliates of the small group of terrorists which calls itself Nationalist Party of Puerto Rico.

"The people of Puerto Rico condemn and repudiate always the actions of that group of fanatical terrorists.

"Between Puerto Rico and the United States there exist ties maintained by the common citizenship and mutual respect by the will both of the people of Puerto Rico and of the Congress of the United States.

"THEREFORE, Be it resolved by the Legislative Assembly of Puerto Rico in behalf of all the people of Puerto Rico:

"(c) Immediately after these occurrences Pedro Albizu Campos made public statements in 'El Imparcial' newspaper of March 3, 1954, justifying the events which took place in the Congress and labelling the same a 'march of sublime heroism.'[20]

"(d) On March 6, when the peace officers appeared in the residence of Pedro Albizu Campos for the purpose of enforcing

---

"1. To repudiate and condemn energetically the cowardly and inconceivable attempt on the life of men who represent a people by the free will of that people.

"2. To make known before the world that the act which we now repudiate and condemn, far from representing any expression of the people of Puerto Rico, represents an aggression against our own people and arouses such a degree of wrath and indignation that it is difficult to describe in any language.

"3. To transmit to the Congress of the United States and to the distinguished injured congressmen the adherence and solidarity of the Legislative Assembly and of all the people of Puerto Rico."

[20] The text of those statements, which were incorporated as a footnote in paragraph (c) copied above, is as follows:

"For more than a half a century our country has been suffering the military intervention of the United States. The military intervention is the war in all its aspects: economic, political, cultural, etc., because military interventions are carried out with one sole purpose, which is to destroy the nationality occupied and to convert it into a colony of the empire, exploitable in all its forms.

"The consequences of the military intervention of the United States in Puerto Rico are no longer a mystery to anyone in the world. Simply they have been devastating, destructive of our nationality.

"Our faith in the law gave us great patience to resist the misfortunes of the occupying American power. Our patience has confused the executives of the United States who have included us among the passive countries of the world and led them to such insolence that, being the victims of their empire, they pretend to recruit our sons by force in order to serve their imperialistic aims in the whole world.

"Since under the Constitution of the United States every revenue law must originate in the House of Representatives of that country, and since the Universal Military Service is a contribution of blood, the maximum contribution which may be imposed, it is in that House where all compulsory military service laws have originated and which the United States has imposed on Puerto Rico.

"It is in that House of Representatives where the Puerto Rican repulsion has reached its tragic intensity.

"The foreign despotism is exercised by law of the despotic nation. The congresses and the parliaments are the ones which establish the

the executive order revoking the pardon and ordering his arrest, Albizu and his followers Doris Torresola, Carmen María Pérez, Isabel Rosado Morales, and José Rivera Sotomayor, all of whom were members of the group known as 'Nationalist Party of Puerto Rico,' offered resistance and fired at the members of the Police.

"(e) After arresting Pedro Albizu Campos and his said followers, the premises where they were arrested was searched and a large number of weapons and ammunitions were seized."

despotic legalism. The Congress of the United States is the body responsible for the military intervention of the United States in Puerto Rico for more than 50 years. '

"The senators and representatives of that legislative body are the ones who send us what they call 'organic acts,' namely, the acts which they impose upon the imperialistic slavery. The insolence of those men is such that they classify Puerto Rico as a public land of the United States. Thus, the judicial agencies of Yankeeland come to Puerto Rico to exercise authority and judicial authority, and the presidents of the United States dare to say with the greatest insolence what part, whether part or the whole of the Puerto Rican national territory, is a forest of the United States.

"We fail to see how a nation has been able to tolerate so much insolence for such a long time.

"History repeats itself: because women represent the nationality. Because she is always a representative value; it is she and posterity.

"A Puerto Rican heroine, of sublime beauty, has again proved to the history of all nations that the woman is the country and that a slave mother cannot be conceived. Nor is it possible to harbor the idea that the country be slave.

"Lolita Lebrón and the men of the race who accompanied her in that journey of sublime heroism have warned the United States, emboldened by their atomic bombs, that they are bound by duty to respect the independence of all nations; to respect the independence of Puerto Rico. And the Puerto Ricans shall command respect of that sacred duty of the country."

Petitioner considered that the foregoing statements were irrelevant in the case because: (1) they did not show that Albizu participated in the act itself; (2) that he planned the attack on the Congress; and further, because (3) they were merely an expression of his criterion within his right to freedom of speech; and (4) the conditions of the pardon specifically provided that Albizu would not subvert the Government of Puerto Rico, while the four Nationalists who attacked the Congress were tried and convicted of attack against the Federal Government, against the integrity of the Congress of the United States, and not against the Government of Puerto Rico.

The following averment, which was incorporated the day of the trial in paragraph (a) of the answer, was not admitted and was therefore controverted:

"During the period involved in this petition, the group known as Nationalist Party of Puerto Rico advocated the separation of Puerto Rico from the United States by force and violence."

In order to examine the propriety and juridical effect in the decision of this case of all the elements of proof to be considered, including the admissions recited above as well as the judicial notice, we turn forthwith to set out briefly the additional evidence offered by defendant the day of the hearing in support of the executive action revoking the pardon.

*Sworn Statement of Captain Benigno Soto:*

There was offered and admitted, by stipulation of the parties, in substitution of his testimony on the witness stand, and with petitioner's saving clause that she considered the facts stated therein irrelevant to the proceeding, a sworn statement given on March 9, 1954, by the Captain of Police of Puerto Rico, Benigno Soto, before the Special District Attorney-at-Large who investigated the events which occurred on the morning of the 6th of that month, when the witness and other peace officers were executing several warrants of arrest, issued by judicial authority, against several members of the Nationalist Party[21] who were in the premises of the office of the "National Junta" of that group in San Juan, where its President, Pedro Albizu Cam-

---

[21] The persons against whom Capt. Soto had in his possession warrants of arrest for violation of Act No. 53 of June 10, 1948, then in force, as amended by that date, and who offered resistance to the arrest in a shooting with the police, but who finally surrendered and were arrested, *People* v. *Rivera*, No. 16041, order of June 10, 1960 (all of which, naturally, is known to the Court), were José Rivera Sotomayor, Doris Torresola, and Carmen María Pérez. Isabel Rosado Morales also took part in the resistance to the police on that occasion and she was also arrested there. Capt. Soto had in his possession an order against Albizu Campos for revocation of the pardon, also containing the order for his arrest and recommitment.

pos, also resided, on which occasion they were also executing the Governor's order revoking the pardon and the warrant for the arrest and recommitment of Albizu himself, in compliance with the terms of such order.

This statement sets forth the facts on which defendant based his allegation of paragraph (d) of the answer, which, as stated above, was admitted subject to petitioner's position that, inasmuch as the revocation of the pardon had been made prior to the resistance offered by Albizu and his followers on that occasion, such evidence was irrelevant; and it also substantiates the averment of paragraph (e) of the answer as to the weapons and ammunitions which were seized immediately after the arrest of Albizu and other members of his organization in the premises of the central offices of the "Nationalist Party of Puerto Rico."

*Testimony of Francisco Cortés Ruiz:*

Defendant called Francisco Cortés Ruiz to the witness stand. The following is a summary of his testimony. His name, the aforesaid. Forty-two years of age. Was an active member of the Nationalist Party of Puerto Rico from 1951 to 1953. He arrived in Chicago in 1950, and Gonzalo Lebrón Sotomayor (married to a cousin of Cortés Ruiz) spoke to him about nationalism and convinced him. That is how he came to join the Nationalist Party. Gonzalo Lebrón was the delegate of the Nationalist Party of Puerto Rico in the city of Chicago. The Chicago Junta was an official board of the Nationalist Party of Puerto Rico, a branch of the Puerto Rican nationalism. Six or seven months after joining the Nationalist Party, Cortés Ruiz was made Chairman of the Chicago Junta. He joined the party some time in June 1951 and in the early part of 1952 he was made Chairman of the Junta. The greater part of the time he was engaged in civic activities for the purpose of collecting funds. The money collected was sent by draft, in a letter written

by Gonzalo Lebrón Sotomayor and signed by Cortés Ruiz, as Chairman, addressed to Juan Hernández Vallé. Lebrón was "the brain of the Nationalist Party in that city." The Chicago Junta also "collected money to purchase firearms." Some time in 1953 he purchased four pistols, three of which were Luger[21a] and one a P-38, in a store by the name of Escaramuza, the owner of which sent them to Gary, Indiana. Cortés Ruiz went to that town together with another member of the Nationalist Party in that city, named Ángel Luis Medina, to fetch them and take them to Chicago. On another occasion in 1953 they purchased two other pistols and a carbine.

Cortés Ruiz was Chairman of the Chicago Junta until "1952" when he became ill and returned to Puerto Rico for the purpose of undergoing surgery of the throat. After he was operated on, he called on Juan Hernández Vallé at 56 Fortaleza Street, second floor, because "I wanted to see him in order to find out to whom the money collected in the city of Chicago was sent." Upon his return to that city Gonzalo Lebrón designated him military instructor of the Nationalist Junta, his commitment being to teach the members thereof to load and unload the weapons. In October 1953 he came to Puerto Rico again via New York bringing with him a letter from Gonzalo Lebrón for Juan Hernández Vallé, with instructions to place himself at the latter's disposal. Prior to that trip to Puerto Rico via New York, Cortés Ruiz had made another trip from Chicago to New York in the company of Ángel Luis Medina, "in the second half of 1953," for the purpose of taking the four pistols which they had purchased and delivering them to the Nationalist movement in that city. He had instructions from Gonzalo Lebrón to contact Julio Pinto Gandía in New York,

---

[21a] The witness testified "Luger," as verified by the magnetophonic recording of his testimony. "Ludwig" appears erroneously on two occasions in the transcript.

who designated Juan Francisco Ortiz to receive the weapons. He spoke with Hernández Vallé in the house of Rosa Collazo, wife "of a Nationalist who is in prison" named Oscar Collazo.

When he travelled to Puerto Rico in October 1953, he was accompanied by a Nationalist from Chicago named Wilfredo Sánchez Morales. The latter brought an old revolver and Cortés Ruiz a pistol. During the visit which he paid to Hernández Vallé, in the latter's office in San Juan, for the purpose of delivering the letter sent him by Gonzalo Lebrón, Hernández asked him "how were the boys" and if he had any firearms. He inquired whether he planned to see Albizu, and upon answering that he did, he sent him to the general headquarters of the Nationalist Party with a woman who was in the office. There he waited in a room, which was not Albizu's room, and about 15 minutes later Hernández Vallé arrived and requested and obtained permission for Cortés to see Albizu. During the conference the latter spoke to Cortés about the cruel treatment which he was being given, "that they were giving him rays." Witness Cortés described this episode as follows: "Don Pedro Albizu Campos told me then to return immediately, to tell Julio Pinto Gandía there in New York and Gonzalo Lebrón Sotomayor in Chicago to stop putting up a show of patriotism; that if they were receiving the same cruel treatment as Don Pedro Albizu Campos was receiving, referring to Gonzalo Lebrón and Julio Pinto Gandía, he would sweep the place clean with bullets. Then he embraced me and bid me good-by." The witness came out of the room and Hernández Vallé patted him on the back saying, "Paco, think that over."

Sometime thereafter Cortés Ruiz left the Nationalist Party because he realized that he could not accept the policies of the Party, "to kill anyone the way they wanted." Cortés was prosecuted and convicted in a federal court of New York "for being a Nationalist and carrying and trans-

porting weapons from one state to another."[22] The weapons used in the attack on the congressmen on March 1, 1954, were very similar to those which the witness had purchased in Chicago "because there was a Luger pistol with a white barrel" and some 38.

On cross-examination, the witness testified that he had been accused in New York jointly with Gonzalo Lebrón Sotomayor, Ángel Luis Medina, Carlos Aulet, and others whom he could not remember at the moment. He could not recall whether Julio Pinto Gandía and Hernández Vallé had been joined in the information. He pleaded guilty and was sentenced to serve five years on probation. Judgment was rendered after testifying "in my prosecution." He did not know Albizu's whereabouts when he joined the Nationalist Party in 1951, but he knew that Hernández Vallé was the leader of the Party at that time. When he called on Albizu, he thought that he was a very sick man. He did not "digest" what Albizu told him, as Hernández Vallé insinuated, as a result of which he left the Nationalist Party.

Petitioner did not offer any evidence.

■■ The facts admitted by petitioner, coupled with the judicial notice of this Court and those contributed by the testimony of Francisco Cortés Ruiz, apart from the statement of Capt. Benigno Soto, are sufficient to warrant the Governor's action revoking the pardon. Although the juridical test for determining the justification for revocation of the pardon by the Governor should be based on whether or not such action was arbitrary, that is, on the reasonability

---

[22] See *United States* v. *Lebrón*, 222 F.2d 531. The prosecution for conspiracy to overthrow the Government of the United States by force and violence—18 U.S.C. § 2384—before the District Court of the United States for the Southern District of New York included 16 other persons, in addition to Cortés Ruiz, among whom were the four Nationalists who attacked the Congress on March 1, 1954, and Hernández Vallé, Julio Pinto Gandía, Gonzalo Lebrón, Ángel Luis Medina, and other Nationalists of Chicago and New York.

of his action, the elements of proof available in this case satisfy even greater requirements than those of said test.

Settling the principle of the juridical test applicable under the lessor requirement of lack of arbitrariness of the Executive's action, let us examine the evidence in the light of the more stringent norm of probable cause of the offense, in view of the nature of the activity which the condition annexed in the pardon prescribed as cause for revocation. Such condition, as stated in the document, anticipated, as cause for revocation, that should "Pedro Albizu Campos attempt or plot against the public order, intending to subvert by violence or terror the existing constitutional order established, and disregard the will of the people of Puerto Rico democratically expressed by its vote." Hence, the condition was breached if the pardonee (1) performed any act attempting by itself against the public order, by acts of violence or terror, with the intent to subvert the existing constitutional order, even though there was no conspiracy, properly speaking, or whether (2) some act of this nature could be imputed to him as part of a conspiracy.

■ The elements of proof presented and invoked to gauge the action of the Executive in revoking the pardon show that the justification therefor lies within the modality of the conspiracy rather than on acts of violence or terror performed by the pardonee. Since this is so, petitioner's contention that only evidence on acts of Albizu himself from September 30, 1953, the date of the pardon, to the evening of March 5, 1954 when the same was revoked, is pertinent in this proceeding, is clearly untenable, since when there is a conspiracy of continuous nature, as we shall presently see, in which a group drives a final objective by force and terror, the character of this group and its practices revealing the unlawful means employed for the purpose of accomplishing its purposes are pertinent in establishing the nature of the

group activity of which the members participating in that common objective would be responsible under certain requirements of knowledge and nexus.

■■ It is well-settled that when a conspiracy is proven, the acts and statements made by one of the co-conspirators may be considered against all while the conspiracy continues. *Albizu* v. *United States*, 88 F.2d 138 (1st Cir. 1937). We take judicial notice, as we did in *Guadalupe* v. *Bravo, Warden,* 71 P.R.R. 913 (1950), of the events of the week of October 30, 1950 in Puerto Rico and in Washington and of the terrorist character of the group of persons which operated under the name of Nationalist Party, at least since the events of October 1950 until after the attack on the Congress and the arrest of Albizu Campos and his followers in 1954. *United States* v. *Lebrón,* 222 F.2d 531.

According to the testimony of Cortés Ruiz himself, who was one of the conspirators convicted of seditious conspiracy, as we have seen, *United States* v. *Lebrón, supra,* the Chicago Junta, presided over by him on one occasion, was one of the branches of the Nationalist Party of Puerto Rico, as well as that of New York. Notwithstanding Albizu's imprisonment as a result of the events of the week of October 30, 1950, the conspiracy activity continued its course culminating, after Albizu was pardoned, in the attack on the Congress on March 1, 1954. The testimony of Cortés Ruiz, apart from reaffirming the known nexus between the Nationalist Party group and Albizu by reason of the latter being its president and leader, actually established the live functioning of the Nationalist Party of Puerto Rico and the Nationalist Juntas of Chicago and New York, and revealed eloquent points of the co-ordination of activities between those Juntas

and the Nationalist Party of Puerto Rico.[23] *United States* v. *Lebrón, supra.*

The whole of the evidence offered, the admissions, and the judicial notice of the terrorist events of the week of October 30, 1950, here and in Washington, and of official acts of public officers, of the character of the political group known as Nationalist Party of Puerto Rico, Albizu's renewal of the functions as leader of that group and of the direction of its activities when he was released under the conditional pardon on September 30, 1953, place him in the very center of the terrorist conspiracy which, having manifested itself in the events of the week of October 30, 1950, in Puerto Rico and in Washington, again repeated itself on March 1, 1954, by the attack on the Congress by four members of the group convicted, as stated before, jointly with 13 others for seditious conspiracy. 18 U.S.C. § 2384; *United States* v. *Lebrón, supra.*

Albizu's public statements in El Imparcial made on March 3, 1954, prior to the revocation of the pardon by the Governor, justifying the attack of the four Nationalists on the Congress and labelling the same "march of sublime heroism," without ceasing to be a matter of opinion in the exercise of the right of freedom of speech, constitute another ingredient of the entire picture of the conspiracy carried out by the group of which he was leader, in full activity toward a known objective and already attempted before, but not abandoned, which tends to present said attack as a "punishment" to the legislative body of the United States, which it alleges is responsible for "the military intervention" in Puerto Rico, thus maintaining in motion, by the moral stimu-

---

[23] The message which Albizu sent to Gonzalo Lebrón in Chicago and Julio Pinto Gandía in New York with witness Cortés Ruiz "to stop a show of patriotism," and that if any of them were receiving the same treatment as he (Albizu) was receiving, "he would sweep the place clean with bullets," coupled with the comment which Hernández Vallé made to Cortés Ruiz to "think that over," should be taken in the figurative sense in which those expressions were used.

lus of his assent, the incitement to continue the practices and methods of violence thus employed.

█ The events on the morning of March 6, 1954, when Albizu and his followers Doris Torresola, Carmen María Pérez, Isabel Rosado Morales, and José Rivera Sotomayor, all of whom were members of the Nationalist Party, offered resistance and welcomed with bullets members of the Police who went to carry out the warrants of arrest, as well as the great number of weapons and ammunitions found in the premises, are pertinent in this case since, although in time they are several hours subsequent to the revocation of the pardon, they are an essential part of the conspiracy already proven and of its state of continuity, and indicative of the terrorist character of that group as well as of the activity and nexus of those present therein who welcomed the police with bullets, with the conspiracy in motion. It must be borne in mind that the ostensible act required for a conviction, *in a criminal prosecution* for conspiracy, need not necessarily show the substantive offense alleged in the information as objective of the conspiracy, not even an act of a criminal nature in itself. The function of the ostensible act in a conspiracy is simply *to show that the latter is in motion*, and that it is not a mere plan which exists only in the mind of the conspirators, nor a consummated act whose existence already terminated. *Yates* v. *United States*, 354 U.S. 298, 1 L.Ed.2d 1356. In this case the conspiracy continued its course with acts of violence and terror, not with mere words. And the objective being only one, although divers ostensible acts were performed in order to carry them out, no matter where they took place, whether in Puerto Rico, in Washington, Chicago, or New York, all of them formed part of the development of the conspiracy for the same purpose, and were admissible against Albizu for the purpose of determining his breach of the condition of the pardon.

Under the standard of sufficiency of evidence of *Scales* v. *United States*, 367 U.S. 203, 6 L.Ed.2d 782, *cf. Noto* v. *United States*, 367 U.S. 290, 6 L.Ed.2d 836, which is the most stringent standard which we have followed in the analysis of the evidence in this proceeding for the purpose of examining the Governor's determination—although we are not concerned with a criminal prosecution—the requirements to sustain the propriety and reasonability of that executive action are met. Consequently, the second contention made by petitioner is dismissed.

The validity of the Governor's determination revoking Albizu's pardon for breach of the conditions annexed therein for the enjoyment thereof, is sustained and the writ issued is quashed.

Mr. Justice Pérez Pimentel concurs in the result. Mr. Justice Hernández Matos and Mr. Justice Blanco Lugo dissented in an opinion rendered by the latter.

—O—

MR. JUSTICE BLANCO LUGO, with whom MR. JUSTICE HERNÁNDEZ MATOS concurs, dissenting.

Notwithstanding the painstaking efforts with which the majority opinion has been written and the elaborate analysis and intensive dedication which it reveals, I cannot agree that the admissions of petitioner and the evidence—including the judicial notice on which it is heavily relied—are sufficient to satisfy the test of reasonability of the executive action in revoking the pardon granted to Pedro Albizu Campos, and much less that of probable cause for the imputation of an offense. I have no doubt that the long time elapsing between the date of revocation of the pardon—March 6, 1954—and that of the hearing before this Court—May 25, 1964—has prejudiced defendant's opportunities to bring other evidence which the Governor could have had under consideration, and

which, in the performance of his duty to maintain public order, led him to revoke the pardon.[1]

The majority opinion assumes that the evidence and the averments do not show that the revocation of the pardon granted to Albizu Campos was due to the personal commission of acts of violence. It rests solely on the existence of a conspiracy against the public security of which Albizu was part, the purpose of which was to subvert by violence or terror the established constitutional order and to disregard the will of the people democratically expressed by its vote. It is sought to link the prisoner with the conspiracy through the following elements: (1) petitioner's admission of the averment that after he was released by virtue of the pardon granted him, Albizu established his residence in its general headquarters of the group known as "Nationalist Party of Puerto Rico," *resumed his functions as leader of that group, and in that capacity he continued directing the activities thereof*; (2) on the judicial notice that the said group was on the aforesaid dates a terrorist organization, relying on *Guadalupe v. Bravo, Warden*, 71 P.R.R. 913 (1950), and *United States v. Lebrón*, 222 F.2d 531 (1955); (3) the acts of divers members of the group, especially the shooting of several members of the Congress of the United States; (4) certain statements made by Albizu on the occasion of the attack on Congress; and (5) the resistance offered by Albizu and other persons when attempt was made to execute the warrant of arrest issued as a result of the revocation of the pardon, as well as the subsequent finding of weapons

[1] I concur fully with the disposition made in the majority opinion regarding the contention on the summary revocation of the pardon without a hearing. I add that, in my opinion, the reservation that the pardonee could challenge before the courts of justice the revocation thereof could have been subjected to the additional condition that it be made within a period certain, in order to give an opportunity to have available and accessible all the evidence on which the executive action rested. See n. 3 of the majority opinion.

and ammunition in the premises where those persons were found.

From an examination of the foregoing it appears that the nexus which linked Albizu to all the acts flows solely and exclusively from his capacity as leader of the group, namely, that he resumed his functions as such and in that capacity continued directing its activities. Only then would the acts of the other conspirators be attributable to him. It is here where, in my judgment, defendant failed to establish the necessary nexus. The evidence presented by him overcame the admission which in that sense and for the purposes of the averments were made by the attorney for petitioner. In my opinion, it established that Albizu was not actually the *leader in functions* of the Nationalist group—it may be concede that he was nominally the leader or symbol of the cause—and that his health was poor[2]—Cortés Ruiz thought that he was "very sick"—not only physically but mentally, for he attributed his ailment to the "cruel treatment which he was being given," that "they were applying him rays"; "to try to get out soon from there [he refers to Albizu's room where the conference with the witness took place] because I did not know how to evade it." If anything, what the testimony of Francisco Cortés Ruiz tends to show is that even after the pardon was granted, the communication of the cells of the group in Chicago and New York with San Juan was made through Juan Hernández Vallé; that Cortés visited the latter in October 1953 carrying a letter from Gonzalo Lebrón, one of the directors of the New York Junta, and that Hernández was the one who suggested that he call on Albizu, and it was not until Hernández arrived and procured permission that he was able to see Albizu. He expressly admitted on cross-examination that *"he knew that*

---

[2] It must be noted that the reasons adduced in September 1953 for the exercise of executive clemency were "the poor health and advanced age of the prisoner."

*Hernández Vallé was the leader of the party at that time.*" I do not attribute to Albizu's statement, coetaneous with the remark on his poor health, "to tell Pinto Gandía there in New York and to Gonzalo Lebrón Sotomayor in Chicago to stop acting a show of patriotism, that if they were receiving the same cruel treatment as Pedro Albizu Campos . . . he [Albizu] would sweep the place clean with bullets," the significance which it is sought to have, since the interpretation of the figurative sense was made by Hernández Vallé, "Paco, think that over."

It is most significant that Albizu was not prosecuted for the events of March 6, 1954, jointly with the persons who accompanied him, see *People* v. *Rivera Sotomayor*, No. 16401, decided June 10, 1960, neither for *conspiracy* under § 2384, Title 18 of the United States Code, see *United States* v. *Lebrón*, 222 F.2d 531 (1955), nor in the company of Hernández Vallé, for violation of Act No. 53 of June 10, 1948, see *People* v. *Hernández Vallé*, criminal case No. 15967.[3] All of these proceedings are connected with the acts occurring between the pardon and its revocation.

Lastly, Albizu's statements shortly after the events in Congress merely constitute the exercise of his right to speak freely, and, although they are full of patriotic fervor, in the opinion of the group to which he belongs, they come within the expression of the pardon—a clear index of the Executive's respect to the democratic principles—that "Nothing in this proclamation shall be construed as a limitation of the freedom of speech of Pedro Albizu Campos, if he so desires, to struggle, through constitutional and democratic means, for the independence of Puerto Rico, or for any other

[3] Hernández Vallé was convicted and sentenced on January 4, 1955, to serve from 3 to 10 years' imprisonment in the penitentiary. He was pardoned by the Governor on July 19, 1957. See *In re Hernández Vallé*, disbarment No. 91. On September 22, 1961, we granted his request to be rehabilitated for the practice of the legal profession.

causes which interest him." The much-emphasized phrase "sublime heroism" may not represent the opinion of a great majority of the Puerto Ricans, but not even by a greater stretch of the imagination may it be said that it is an incitation to the use of force and violence.

I need not elaborate on the analysis of the details of the evidence. I only wish to say that the evidence presented does not satisfy me fully, and for that reason I dissent.